## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| TWENTY-FIRST CENTURY FOX, INC., | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| v. | )   No. 16-1324 |
| | ) |
| FEDERAL COMMUNICATIONS COMMISSION | ) |
| and the UNITED STATES OF AMERICA, | ) |
| | ) |
| *Respondents*. | ) |
| | ) |

### UNDERLYING DECISION FROM WHICH PETITION ARISES

Twenty-First Century Fox, Inc. ("Petitioner") hereby submits Order FCC 16-116, released by the Federal Communications Commission ("FCC") on September 7, 2016, in FCC Docket No. 13-236.  Also attached is a summary of the Order, scheduled to be published in the Federal Register on October 24, 2016.

Dated: October 21, 2016

Respectfully submitted,

*/s/ Mace Rosenstein*
Mace Rosenstein
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
mrosenstein@cov.com

*Counsel to Petitioner Twenty-First
   Century Fox, Inc.*

Federal Communications Commission                    FCC 16-116

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the | ) | MB Docket No. 13-236 |
| Commission's Rules, National Television Multiple | ) | |
| Ownership Rule | ) | |

**REPORT AND ORDER**

**Adopted:  August 24, 2016**                    **Released:  September 7, 2016**

By the Commission:  Commissioners Pai and O'Rielly dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                              Paragraph #

I.   INTRODUCTION ................................................................................................................... 1
II.  BACKGROUND ................................................................................................................... 4
III. DISCUSSION ...................................................................................................................... 16
     A.  Authority to Modify the UHF Discount ...................................................................... 17
     B.  Elimination of the UHF Discount ............................................................................... 25
     C.  Grandfathering of Existing Broadcast Station Combinations ..................................... 41
     D.  VHF Discount ............................................................................................................. 54
IV.  PROCEDURAL MATTERS ................................................................................................ 57
     A.  Final Regulatory Flexibility Analysis ........................................................................ 57
     B.  Paperwork Reduction Act Analysis ............................................................................ 58
     C.  Congressional Review Act .......................................................................................... 59
V.   ORDERING CLAUSES ...................................................................................................... 60
APPENDIX A – Final Rule
APPENDIX B – Final Regulatory Flexibility Analysis
APPENDIX C – List of Commenters and Reply Commenters

I.      **INTRODUCTION**

1.      Today we take an important step to ensure that our broadcast rules remain relevant in the digital age by eliminating an outdated portion of those rules premised on the constraints of old technology. Abolishing the 30-year-old UHF discount, which allowed commercial broadcast television station owners to discount the coverage of certain stations when calculating their compliance with the national audience reach cap,[1] restores meaning to the rule in today's marketplace where technological change has eliminated the justification for the discount.  The discount has outlived its purpose and intent

---

[1] This rule prohibits a single entity from owning television stations that, in total, reach more than 39 percent of all the television households in the nation.  47 CFR § 73.3555(e)(1).  The rule provides a discount, called the "UHF discount," to television stations broadcasting in the UHF spectrum, attributing them with only 50 percent of the television households in their Designated Market Areas (DMAs).  *Id.* § 73.3555(e)(2)(i).  In contrast, VHF stations are attributed with 100 percent of the number of households in the DMA.  VHF television stations broadcast on channels 2-13; UHF stations broadcast on channels 14-51.

10213

and, in the current world, acts only to undermine the national audience reach cap. Today's action should come as no surprise to industry participants. The Commission has indicated repeatedly over the past two decades that the transition to DTV, completed for full-power broadcast television stations in June 2009,[2] would undermine the basis for the UHF discount.

2.      Adopted in 1985, the UHF discount was intended to mitigate the competitive disadvantage that UHF broadcast television stations suffered in comparison to VHF broadcast television stations.[3] At that time, UHF stations were technically inferior, producing weaker over-the-air signals, reaching smaller audiences, and costing more to build and operate than VHF stations.[4] But while UHF channels may have been inferior for purposes of broadcasting in analog, experience since the DTV transition demonstrates that UHF channels are equal, if not superior, to VHF channels for the digital transmission of television signals.[5] Thus, as a result of the DTV transition, the UHF discount can no longer be supported on technical grounds.

3.      Accordingly, we eliminate the discount from the calculation of the national audience reach cap to preserve the effectiveness of this rule. To avoid imposing undue harm on existing broadcast television station groups that exceed the national audience reach cap without the benefit of the UHF discount, we will grandfather the following such combinations: (a) combinations in existence on September 26, 2013 (Grandfather Date), the release date of the Notice of Proposed Rulemaking in this proceeding; (b) combinations created by a transaction that had received Commission approval on or before the Grandfather Date; and (c) combinations proposed in applications pending before the Commission on the Grandfather Date.[6] Any ownership combination so grandfathered but subsequently assigned or transferred must comply with the national audience cap in existence at the time of the transaction. We find that this approach is fair to affected licensees and consistent with Commission precedent. Finally, we decline at this time to adopt a VHF discount. The current record and circumstances do not convince us that digital television operations in the VHF band are technically inferior to UHF in a manner that would warrant the creation of a new discount.

## II.    BACKGROUND

4.      Three decades ago, to protect localism, diversity, and competition, the Commission reaffirmed its rule restricting the total number of commercial broadcast stations a single entity could own nationwide, and adopted a national audience reach cap, restricting the total percentage of households a single entity could reach nationwide.[7] Specifically, the Commission reaffirmed a prior ruling limiting the number of broadcast stations in each service (AM, FM, and television) that a single entity could own to

---

[2] *See* 47 U.S.C. § 309(j)(14)(A).

[3] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* Memorandum Opinion and Order, 100 FCC 2d 74, 88-94, paras. 33-44 (1985) (*1985 TV Ownership Reconsideration*).

[4] *Id.* at 92-94, paras. 42-44 (finding that the "inherent physical limitations" of UHF broadcasting should be reflected in the national TV ownership rules).

[5] *See, e.g.*, *Innovation in the Broadcast Television Bands: Allocations, Channel Sharing and Improvements to VHF*, Notice of Proposed Rulemaking, 25 FCC Rcd 16498, 16511, para. 42 (2010) (*Broadcast Innovation NPRM*) (recognizing the utility of the digital UHF band while seeking comment on ways to improve reception of digital VHF channels).

[6] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14331-32, para. 20 (2013) (*Notice*).

[7] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 88-92, paras. 33-41. *See also Amendment of Section 73.3555 [formerly Sections 73.35, 73.240, and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, Report and Order, 100 FCC 2d 17, 54-56, paras. 108-12 (1984) (establishing a 12 station multiple ownership rule).

12, and amended the rule to include a national audience reach cap, which prohibited a single entity from owning television stations that collectively reached more than 25 percent of the total nationwide audience.[8]  The Commission explained that the cap was intended to temper the ability of the largest group owners to dramatically increase their national coverage areas in response to the relaxation of the previous seven station limit.[9]  The Commission found it essential to impose an audience reach limitation to limit the growth of the largest group owners while giving smaller group owners some opportunity to expand.[10]

5.      At that time, the Commission recognized the "inherent physical limitations" of the UHF television band and sought to account for these limitations in constructing its national audience reach cap.[11]  The Commission specifically found that the delivery of television signals was more difficult in the UHF band because the strength of UHF television signals decreased more rapidly with distance in comparison to the signals of stations broadcasting in the VHF band, resulting in significantly smaller coverage areas and smaller audience reach.[12]  This was particularly significant because, at the time, the vast majority of viewers received programming from broadcast television stations via over-the-air signals.  Thus, a smaller over-the-air signal made it harder for UHF stations to compete with incumbent VHF stations which maintained greater coverage areas.  To account for this coverage disparity, the Commission determined that the licensee of a UHF station should be attributed with only 50 percent of the television households in its market area for purposes of calculating the national audience reach cap.  The Commission concluded that this "UHF discount" provided a measure of the actual reduction in audience reach experienced by UHF stations.[13]  It also concluded that the discount supported the viability of UHF television, which was consistent with traditional diversity objectives.[14]

6.      Eleven years later, in the Telecommunications Act of 1996 (1996 Act), Congress directed the Commission to modify its national television station multiple ownership rule to increase the national audience reach cap from 25 percent to 35 percent and to eliminate the restriction forbidding an entity to own more than 12 broadcast television stations nationwide.[15]  The 1996 Act did not address the UHF discount.[16]

---

[8] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 90-92, paras. 38-40.

[9] *Id.* at 91, para. 40 ("We believe, however, that the 25 percent reach cap adopted herein is a reasonable limit given our traditional policy concerns and in light of our expectations as to the potential economic response of the industry once the current . . . station limit is relaxed. […]  In addition, the 25 percent limit will temper dramatic changes in the ownership structure by the largest group owners in the largest markets.  Alternatively, the smaller multiple owners would be given a greater opportunity to expand.") (footnotes omitted).

[10] *Id.*

[11] *Id.* at 93, para. 43.

[12] *Id.*

[13] *Id.* at 93-94, para. 44

[14] *Id.*  When the Commission adopted the UHF discount in 1985, calculation of national coverage was based on the television households and market rankings defined by Arbitron's Area of Dominant Influence (ADI).  Currently, the Commission relies on DMAs defined by the Nielsen Company (Nielsen) to calculate national audience reach.  Nielsen delineates television markets by assigning each U.S. county (except for certain counties in Alaska) to one market based on measured viewing patterns.  The United States is divided into 210 DMAs.

[15] Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1), 110 Stat. 56, 111 (1996) (1996 Act); *see also Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Ownership and Dual Network Operations)*, Order, 11 FCC Rcd 12374 (1996) (*Implementation Order of Section 202(c)(1) of 1996 Act*).

[16] *Implementation Order of Section 202(c)(1) of 1996 Act*, 11 FCC Rcd at 12375, para. 4.

7.    Although the 1996 Act did not address the UHF discount, in 1996 the Commission noted that the UHF discount was then under consideration in a pending Commission proceeding.[17]  Specifically, in the *1996 Act Implementation Order*, the Commission noted that it was reviewing the UHF discount in the context of its television broadcast ownership rules.[18]  The Commission explicitly cautioned that any entity that acquired stations during this interim period and complied with the 35 percent audience reach cap only by virtue of the UHF discount would be subject to the outcome of the pending television ownership proceeding.[19]  Subsequently, the Commission decided to consider modifications to the UHF discount in the Commission's 1998 biennial review of its broadcast ownership rules.[20]

8.    The Commission subsequently reaffirmed the 35 percent national audience reach cap in its *1998 Biennial Review Order*.[21]  The Commission reasoned that it was premature to revise the national audience reach cap because it had not had sufficient time to fully observe the effects of raising the cap from 25 to 35 percent.[22]  The Commission retained the UHF discount, finding that it remained in the public interest at that time,[23] but indicated that it would likely be unnecessary after the anticipated transition to digital television.[24]  The Commission stated that a Notice of Proposed Rulemaking would be issued in the future to propose phasing out the discount once the digital transition was complete.[25]

---

[17] *Id.* (citing *Review of the Commission's Regulations Governing Television Broadcasting*, Further Notice of Proposed Rule Making, 10 FCC Rcd 3524, 3568-69, para. 102 (1995) (*TV Ownership Further Notice*) (seeking comment on whether the UHF discount should be modified or eliminated).

[18] *Id.* (citing *TV Ownership Further Notice*, 10 FCC Rcd at 3568-69, para. 102).

[19] *Id.*

[20] *Broadcast Television National Ownership Rules et al.*, Notice of Proposed Rule Making, 11 FCC Rcd 19949, 19950, para. 1 (1996).

[21] *1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Report, 15 FCC Rcd 11058, 11072-75, paras. 25-30 (2000) (*1998 Biennial Review Order*).

[22] *1998 Biennial Review Order*, 15 FCC Rcd at 11072, para. 25.  The United States Court of Appeals for the District of Columbia (D.C. Circuit) later remanded the *1998 Biennial Review Order* after finding that the decision to retain the national audience reach cap was arbitrary and capricious.  The D.C. Circuit found the Commission's "wait-and-see" approach to be inconsistent with its mandate to determine on a biennial basis whether the rules were in the public interest.  In addition, the court found that the Commission failed to demonstrate that the national audience reach cap advanced competition, diversity, or localism.  *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1040-49 (D.C. Cir. 2002).  On remand, the Commission determined that the national ownership cap should be raised to 45 percent.  2002 *Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13842, 13843-44, paras. 578, 580-83 (2003) (*2002 Biennial Review Order*).

[23] *1998 Biennial Review Order*, 15 FCC Rcd at 11078, para. 35.

[24] *Id.* at 11079-80, para. 38.  We note that as early as 1992 the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount.  *See Review of the Commission's Regulations Governing Television Broadcasting*, Notice of Proposed Rule Making, 7 FCC Rcd 4111, 4115 n.37 (1992) (*TV Ownership NPRM*) (seeking comment on whether any distinction between UHF and VHF stations would be appropriate in light of the potential transition to advanced television technology).

[25] *1998 Biennial Review Order*, 15 FCC Rcd at 11079-80, para. 38.  The Commission reiterated its previous statement that while the UHF discount was under review any entity that acquired stations during the interim period, between implementation of the 35 percent audience reach cap pursuant to the 1996 Act and any Commission decision on the UHF Discount, and that complied with the 35 percent audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's decision on the UHF discount.  *Id.* at 11080 n.108 (citing *Implementation Order of Section 202(c)(1) of 1996 Act*, 11 FCC Rcd at 12375, para. 4).  The Commission

(continued….)

9.      The Commission subsequently reexamined the issues in its *2002 Biennial Review Order*.[26] At that time, the Commission found that the national audience reach cap, while not necessary to promote competition and diversity, nonetheless remained necessary to promote localism.[27] Further, the Commission decided that an increase in the cap to 45 percent was justified.[28] The Commission concluded that a 45 percent cap would strike an appropriate balance by permitting some growth for the Big Four broadcast networks (ABC, CBS, NBC, and Fox) and allowing them to achieve greater economies of scale, while at the same time ensuring that the network-owned stations could not reach a larger national audience than their affiliates collectively.[29] The Commission also found that setting the cap at 45 percent was consistent with Congress's action in the 1996 Act, in which Congress raised the ownership limit by 10 percentage points.[30]

10.     At the same time, the Commission again reaffirmed the UHF discount, finding that there continued to be a technical disparity between the reach of UHF and VHF signals, which diminished the ability of UHF stations to compete effectively.[31] The Commission concluded, however, that "the digital [television] transition [would] largely eliminate the technical basis for the UHF discount because UHF and VHF signals [would] be substantially equalized."[32] Accordingly, the *2002 Biennial Review Order* adopted rules to phase out the UHF discount for broadcast stations owned by the Big Four networks on a market-by-market basis at the time the markets transitioned to DTV (as the transition was contemplated at the time).[33] The Commission noted that this phase-out of the UHF discount would apply unless it made an affirmative determination that the discount continued to serve the public interest beyond the digital transition. The Commission indicated further that, for networks and station groups other than those stations owned and operated by the Big Four networks, it would review the status of the UHF discount in a subsequent biennial ownership review and decide at that time whether to extend the sunset to all other networks and station group owners.[34]

11.     Following adoption of the *2002 Biennial Review Order*, Congress subsequently rolled back the increase in the national audience reach cap. Specifically, Congress included a provision in the

(Continued from previous page) ───────

stated that it would "continue to follow this policy until such time as the UHF discount is modified or eliminated." *1998 Biennial Review Order*, 15 FCC Rcd at 11080 n.108.

[26] *2002 Biennial Review Order*, 18 FCC Rcd at 13845-47, paras. 585-91 (2003).

[27] *Id.* at 13842, para. 578.

[28] *Id.* at 13814, para. 499.

[29] *Id.* at 13843-44, paras. 581-83.

[30] *Id.* at 13843-44, para. 582.

[31] *Id.* at 13845-46, paras. 586-87. The Commission also determined that UHF stations required more expensive transmitters and incurred higher electricity costs, as much as 1.5 to 3 times greater than the electricity needed for a VHF station. The Commission concluded further that the UHF discount was still needed, in part, to encourage entry and competition among broadcast networks. *Id.* at 13846-47, paras. 588-89.

[32] *Id.* at 13847, para. 591.

[33] The rules in existence at the time contemplated a gradual, market-by-market transition from analog broadcasting to digital broadcasting as the penetration of digital television viewing capability reached a sufficient threshold in each market. That approach was subsequently replaced by a hard deadline set by Congress; the deadline was initially February 17, 2009, and later extended to June 12, 2009. Digital Television Transition and Public Safety Act of 2005, Pub. L. No. 109-171, § 3002, 120 Stat. 4, 21-22 (2006) (setting DTV transition deadline as February 17, 2009); DTV Delay Act of 2009, Pub. L. No. 111-4, § 2(a)(1), 123 Stat. 112 (2009) (extending DTV transition deadline to June 12, 2009) (both codified at 47 U.S.C. § 309 note). *See also* 47 U.S.C. § 309(j)(14)(A).

[34] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591. In phasing out the UHF discount for broadcast stations owned by the Big Four broadcast networks, the Commission noted that they owned relatively few UHF stations (12 out of 67). *Id.*

Federal Communications Commission                    FCC 16-116

2004 Consolidated Appropriations Act (CAA) directing the Commission to modify its ownership rules to set the national audience reach cap at 39 percent of national television households.[35]  The CAA further amended Section 202(h) of the 1996 Act to require a quadrennial review of the Commission's broadcast ownership rules rather than the previously mandated biennial review.  In doing so, Congress removed the requirement to review "any rules relating to the 39 percent national audience reach limitation" from the quadrennial review requirement.[36]  The CAA did not mention the UHF discount, nor did it address the potential impact of the DTV transition on the calculation of the national audience reach cap.

12.    Prior to the enactment of the CAA, several parties had appealed the Commission's *2002 Biennial Review Order* to the U.S. Court of Appeals for the Third Circuit (Third Circuit).  In June 2004, the Third Circuit found that the challenges to the Commission's actions with respect to the national audience reach cap and the UHF discount were moot as a result of Congress's action.[37]  The court determined that the Commission was under a statutory directive, following the CAA, to modify the national audience reach cap to 39 percent, and that, as a result, challenges to the Commission's decision to raise the cap to 45 percent were no longer justiciable.[38]  The court held that the CAA similarly rendered moot the challenges to the Commission's decision to retain the UHF discount.[39]  The court found that the CAA insulated the national audience reach cap, including the UHF discount rule, from the Commission's quadrennial review of its media ownership rules.[40]  At the same time, the court stated that its decision did not "foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)."[41]  The court concluded that, barring congressional intervention, "the Commission may decide, in the first instance, the scope of its authority to modify or eliminate the UHF discount outside of [Section] 202(h)."[42]

13.    In July 2006, the Commission issued a Further Notice of Proposed Rulemaking as part of its 2006 quadrennial review of the media ownership rules.[43]  Among other things, the *Further Notice* sought comment on the UHF discount rule in light of the Third Circuit's holding and queried whether the

---

[35] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

[36] *Id.*

[37] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395-97 (3d Cir. 2004) (*Prometheus I*).

[38] *Id.* at 396.

[39] *Id.*  Because Congress superseded the Commission's decision to set the national audience reach cap at 45 percent without considering or addressing specifically the Commission's authority to amend the UHF discount, the CAA did not have any implications concerning the Commission's authority to amend the UHF discount.  The *Notice's* reference to the CAA superseding the *2002 Biennial Review Order* refers to the 45 percent national audience reach cap and the Commission's ability to act on the cap and the UHF discount in the context of the quadrennial review, not the Commission's authority outside the quadrennial review.  *See Notice*, 28 FCC Rcd at 14327, para. 9.

[40] *Prometheus I*, 373 F. 3d at 396-97.

[41] *Id.* at 397.  Prior to the court's decision, in February 2004, the Media Bureau issued a Public Notice specifically seeking comment on the Commission's authority to modify or eliminate the UHF discount in light of the CAA.  In particular, the Media Bureau sought comment on whether the "passage of the 39 [percent] cap [signifies] congressional approval, adoption, or ratification of the 50 [percent] UHF discount."  The comments and replies were filed in the docket for the *2002 Biennial Review Order.  Media Bureau Seeks Additional Comment on UHF Discount in Light of Recent Legislation Affecting National Television Ownership Cap*, Public Notice, 19 FCC Rcd 2599, 2600 (2004).  *See also Comment and Reply Comment Dates Set for Comments on UHF Discount In Light of Recent Legislation Affecting National Television Ownership Cap*, Public Notice, 19 FCC Rcd 3917 (2004).

[42] *Prometheus I*, 373 F.3d at 397.

[43] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Further Notice of Proposed Rulemaking, 21 FCC Rcd 8834 (2006) (*Further Notice*).

Commission "should retain, modify, or eliminate the UHF discount."[44] In February 2008, the Commission concluded in the *2006 Quadrennial Review Order* that "the UHF discount is insulated from review under Section 202(h)" as a result of the CAA, and thus beyond the parameters of the quadrennial review.[45] But the Commission noted that the Third Circuit's 2004 decision had left it to the Commission to decide the scope of its authority to modify or eliminate the UHF discount outside the context of Section 202(h).[46] Accordingly, the Commission indicated that it would address the petitions, comments, and replies filed with respect to the alteration, retention, or elimination of the UHF discount in a separate proceeding, which would be commenced at a future date.[47]

14.    Since June 13, 2009, all full-power television stations have broadcast their over-the-air signals exclusively in digital form.[48] The DTV transition has enabled broadcasters to provide multiple programming choices, higher quality video, and enhanced capabilities to consumers.[49] Yet the transition has posed more challenges for VHF channels than UHF channels because VHF spectrum has proven to have characteristics that make it less desirable for providing digital television service.[50] For instance, nearby electrical devices tend to emit noise that can cause interference to DTV signals within the VHF band, creating reception difficulties in urban areas even a short distance from the TV transmitter. The reception of VHF signals also requires physically larger antennas compared to UHF signals.[51] For these reasons, among others, television broadcasters generally have faced greater challenges providing consistent reception on VHF signals than UHF signals in the digital environment, and some station owners have therefore opted to migrate their signals from VHF to UHF.[52]

15.    On September 26, 2013, the Commission issued the *Notice* in this proceeding seeking comment on the Commission's authority to modify the national audience reach cap contained in Section 73.3555(e)[53] and proposing to eliminate the UHF discount.[54] The *Notice* also tentatively proposed, in the

---

[44] *Id.* at 8848-49, paras. 34-35. The *Further Notice* refreshed the Commission's record on its authority to alter the UHF discount.

[45] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2084-85, para. 143 (2008) (*2006 Quadrennial Review Order*), *aff'd in part, rev'd in part sub nom. Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).

[46] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2085, para. 144.

[47] *Id.* Although the Commission indicated in 2008 that a rulemaking addressing the UHF discount would be forthcoming, such a proceeding was not commenced until the issuance of the *Notice* on September 26, 2013.

[48] FCC, *Digital Television*, http://www.fcc.gov/general/digital-television (visited June 20, 2016) (DTV Website).

[49] *Id. See also 2 Days and Counting to DTV Transition*, Press Release (rel. June 10, 2009) ("In addition to more channels and more programs, the switch to digital will also reward most viewers with better sound and a better picture."), *available at* https://apps.fcc.gov/edocs_public/Query.do;jsessionid=GVGbXybCt0P42DQvJ7Myc7mtvXrlMxRZvnBk2ylPb27JFrT2p0fv!1910990845!1500434201?numberFld=&numberFld2=&docket=&dateFld=06%2F10%2F2009&docTitleDesc=DTV+Transition (visited June 20, 2016).

[50] *See, e.g., Broadcast Innovation NPRM*, 25 FCC Rcd at 16511, para. 42.

[51] *Id.*

[52] *Id. See also infra* para. 33. The Commission has also taken a number of actions to help individual VHF stations cope with these difficulties. *See, e.g.*, Letter from Barbara A. Kreisman, Chief, Video Division, Media Bureau, to ABC, Inc. and Freedom Broadcasting of New York Licensee, LLC (March 16, 2011), at http://licensing.fcc.gov/cgi-bin/prod/cdbs/forms/prod/getimportletter_exh.cgi?import_letter_id=24962 (visited June 21, 2016) (Video Division March 16, 2011, Letter) (permitting two television broadcasters to operate facilities exceeding the maximum power and antenna height in an attempt to resolve VHF reception issues).

[53] 47 CFR § 73.3555(e).

event that the Commission eliminated the UHF discount, to grandfather existing television station combinations that would exceed the 39 percent national audience reach cap in the absence of the UHF discount. Finally, the *Notice* sought comment on whether a "VHF discount" should be adopted.[55]

## III.   DISCUSSION

16.     As described below, we conclude that the Commission has the authority to eliminate the UHF discount, and in doing so, we eliminate an obsolete mechanism that undermines the regulation it was originally designed to promote.[56] We grandfather certain existing station combinations that would otherwise violate the national audience reach cap solely as a result of our action. We find that the benefits of our decision to eliminate the UHF discount outweigh any costs or other burdens that may result from our action. Finally, we decline to adopt a VHF discount at this time.

### A.     Authority to Modify the UHF Discount

17.     In the *Notice*, the Commission tentatively concluded that it has the authority to revise the national audience reach cap as well as to alter or eliminate the UHF discount and requested comment on these conclusions.[57] Many commenters, including NAB, Free Press, and the Public Interest Commenters, filed comments in support of the Commission's conclusion.[58] Specifically, NAB agrees with the Commission's conclusion that it maintains the authority to reexamine its national audience reach cap and the methodologies for calculating compliance with the rule.[59] In addition, Free Press argues that the Communications Act as well as the Commission's public interest standard provide the Commission with ample authority to revisit the UHF discount.[60] Free Press asserts that the Commission has the ability to decide the scope of its authority to reexamine the UHF discount outside the Commission's quadrennial review.[61] The Public Interest Commenters submit that the Commission has discretion under the CAA to decide its own authority to modify or eliminate the UHF discount outside of the quadrennial review process.[62]

18.     A few commenters, however, challenge the Commission's authority to revise or eliminate either the national audience reach cap or the UHF discount.[63] Fox asserts that Congress expressly insulated the cap from any alteration by carving the rule out from the Commission's periodic review under Section 202(h) of the 1996 Act and shielding it from the Commission's forbearance authority.[64]

(Continued from previous page)
[54] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

[55] *Id.* at 14332-33, para. 23.

[56] *See* Exec. Order No. 13579, 76 Fed. Reg. 41587 (July 14, 2011) (directing independent regulatory agencies to review their regulations to "determine whether any such regulations should be modified, streamlined, expanded, or repealed.").

[57] *Notice*, 28 FCC Rcd at 14329-30, paras. 13-15.

[58] *See, e.g.*, NAB Comments at 1; Free Press Comments at 1-2.

[59] NAB Comments at 1; Free Press Comments at 1-2; Public Interest Commenters Reply 4-6.

[60] Free Press Comments at 1-2.

[61] *Id.* at 2.

[62] Public Interest Commenters Reply at 4-6.

[63] *See, e.g.*, Fox Comments at 4-12; Letter from Jared S. Sher, Senior Vice President and Associate General Counsel, 21ˢᵗ Century Fox, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-326, at 1 (filed June 9, 2016) (Fox June 9, 2016, *Ex Parte* Letter); Sinclair Comments at 5-8; ION Comments at 11-14; Trinity Comments at 1-5.

[64] Fox Comments at 7-10. Fox also points to Third Circuit precedent and legislative history for support that adjusting the discount would undermine the congressionally established 39 percent national audience reach cap. *Id.* at 10-12.

Fox contends that modification of the cap outside of Section 202(h) would violate the CAA because Congress intended "to ensure that the FCC would have no further independent authority to modify the cap."[65]

19.    Similarly, Sinclair, ION, and Trinity argue that the CAA stripped the Commission of its authority to modify the 39 percent national audience reach cap by removing it from the scope of the Commission's statutorily mandated quadrennial review.[66]  Sinclair suggests further that, under principles of statutory construction, the CAA taken as a whole demonstrates that Congress did not intend the Commission to have the authority to modify or eliminate either the UHF discount or the cap.[67]  Trinity asserts that, absent a specific directive from Congress, the Commission lacks the substantive and procedural authority to eliminate or modify the national audience reach cap or the UHF discount.[68]

20.    Other commenters assert that the Commission lacks authority to eliminate the discount except in the context of a larger action that also amends the national audience reach cap.[69]  For instance, several broadcast commenters argue that Congress was well aware of the UHF discount and intended to include the discount in establishing the precise 39 percent cap.[70]  Fox and Sinclair argue that elimination

---

[65] *Id.* at 8.  *See also* Fox June 9, 2016, *Ex Parte* Letter at 1.

[66] Sinclair Comments at 6; ION Comments at 11-12; Trinity Comments at 2.

[67] Sinclair Comments at 6-7.  In addition, ION contends that the only reasonable construction of Section 202 of the 1996 Act is that Congress intended the quadrennial review process to be the only means for the Commission to review and update its media ownership rules.  Specifically, ION claims that because Congress excluded examination of the national audience reach cap from the scope of the quadrennial review process, the Commission is presumably barred from reviewing or modifying the national audience reach cap under its general rulemaking authority.  ION Comments at 12-13.  ION argues further that the Third Circuit's decision in *Prometheus I* does not provide the support for the Commission's assumption of authority to modify the UHF discount.  *See id.* at 13-14.

[68] Trinity Comments at 2-5;  Letter from Colby M. May, Counsel to Trinity Broadcasting Network, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 2 (filed July 29, 2016) (Trinity July 29, 2016, *Ex Parte* Letter at 2).

[69] Sinclair also contends that the cap itself is unconstitutional and that the Commission should stop enforcing it for that reason, claiming that the cap restricts group owners' speech, cannot survive strict scrutiny and thus violates the First Amendment; violates the Equal Protection clause of the Constitution because broadcast television licensees are the only communications providers subject to a national cap; and violates broadcasters' due process rights because the cap is unsupported and therefore is arbitrary and capricious.  Sinclair asserts that the cap could not survive strict scrutiny review of any of its constitutional claims.  Sinclair Comments at 10-12.  Sinclair fails to support its cursory assertions with any analysis.  Regarding the First Amendment claim, the D.C. Circuit has rejected the argument that the national TV cap is subject to strict scrutiny for purposes of the First Amendment and held that the 35 percent statutory ownership cap was constitutional under rational basis analysis.  *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1045-47 (D.C. Cir. 2002).  Nor has Sinclair provided any justification for its statement that judicial review of the national cap is subject to strict scrutiny for purposes of its other arguments.  Sinclair does not even claim that the national cap could not survive rational basis review, which would apply in this case because the national cap is not based on suspect classifications and does not violate the First Amendment.  *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").  *See also 2002 Biennial Review Order*, 18 FCC Rcd at 13828-34, paras. 538-52 (concluding that some national cap is necessary to preserve and promote localism).

[70] *See, e.g.*, Sinclair Comments at 5-7; Fox Comments at 4-12; Fox June 9, 2016, *Ex Parte* Letter at 1-2; Univision Comments at 13; ION Comments at 11-12; Trinity Comments at 1-5.  Sinclair notes that when Congress raised the national audience reach cap from 25 percent to 35 percent in 1996, it expressly approved the use of the UHF discount.  Sinclair Comments at 2 & n.7 (citing H.R. Rep. No. 104-204 at 118 ("This 'UHF discount' appropriately reflects the technical and economic handicaps applicable to UHF facilities and the Committee does not envision that the UHF discount calculation will be modified so as to impede the objectives of this section.")).  *See also* Fox Comments at 11-12.

of the discount effectively results in a reduction of the cap and so the Commission cannot eliminate the discount unless it also amends the cap, presumably by increasing the permissible audience reach.[71] Similarly, Univision claims that the UHF discount is inextricably tied to the national audience reach cap and can be reconsidered only in conjunction with consideration of the cap.[72] Fox argues further that the CAA converted the national audience reach cap into a statutory standard.  Thus, in Fox's view, altering the discount effectively modifies the cap, which violates the plain text of the statute.[73]  These commenters point to the CAA's legislative history, which indicates that the cap was set at 39 percent to avoid divestiture of broadcast interests by certain parties that would be required without the discount.[74]

21.     We conclude that the Commission has the authority to modify the national audience reach cap, including the authority to revise or eliminate the UHF discount.[75]  We find that no statute bars the Commission from revisiting the cap or the UHF discount contained therein in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act.  The CAA simply directed the Commission to revise its rules to reflect a 39 percent national audience reach cap and removed the requirement to review the national ownership cap from the Commission's quadrennial review requirement.[76]  It did not impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule.[77]  Thus, the Commission retains authority under the Communications Act to review any

---

[71] Specifically, these commenters note that the CAA uses the term "national audience reach," which, commenters reason, under the Commission's rules, includes the UHF discount.  These commenters allege that the use of the term demonstrates Congress's belief that the national audience reach cap and the discount are inextricably related.  *See* Fox Comments at 4-6; Fox June 9, 2016, *Ex Parte* Letter at 1; Sinclair Comments at 5; Trinity Comments at 5.

[72] Univision Comments at 13.

[73] Fox Comments 6-7; Fox June 9, 2016, *Ex Parte* Letter at 1.

[74] Sinclair Comments at 5 & n.25 (citing the legislative history of the CAA); Fox Comments at 12 & nn.33-34 (citing the legislative history of the CAA).

[75] 47 CFR § 73.3555(e).

[76] The CAA states in relevant part:

The Telecommunications Act of 1996 is amended as follows--

(1) in section 202(c)(1)(B) by striking "35 percent" and inserting "39 percent";

(2) in section 202(c) by adding the following new paragraphs at the end:

"(3) Divestiture.--A person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation.  This divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.

(4) Forbearance.--Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B);"; and

(3) in section 202(h) by striking "biennially" and inserting "quadrennially" and by adding the following new flush sentence at the end:

"This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).".

CAA § 629(1) & (3).

[77] *Id.*  The CAA also provides that the Commission may not apply its forbearance authority under Section 10 of the Communications Act, 47 U.S.C. § 160, to any person or entity exceeding the 39 percent national audience reach cap. *See id.* § 629(4).  While the meaning of this provision is unclear given that forbearance authority does not apply to

(continued….)

aspect of the national audience reach cap; it simply is not required to do so as part of the quadrennial review. Specifically, the Communications Act gives the Commission the statutory authority to revisit its own rules and revise or eliminate them when it concludes such action is appropriate. The Act authorizes the agency to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."[78] Similarly, Section 303(r) provides that the Commission may "[m]ake such rules and regulations . . . not inconsistent with this law, as may be necessary to carry out the provisions of this Act . . . ."[79] Indeed, courts have held that the Commission has an affirmative obligation to reexamine its rules over time.[80] In *Bechtel v. FCC*, the court observed that "changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so. In the rulemaking context, an agency also may be obligated to reexamine its approach 'if a significant factual predicate of a prior decision has been removed.'"[81] As we explain further below, this is precisely the case in this instance.

    22.    With respect to the UHF discount contained in the rule, even those advocating retention of the discount based on the CAA acknowledge that the CAA does not even mention the UHF discount.[82] Some commenters argue that the CAA should be interpreted as acknowledging the UHF discount because we should read it into Congress's intended definition of the term "national audience reach," which is included in that statute.[83] But the CAA does not include any language to indicate that Congress intended to preclude the Commission from reexamining the "national audience reach" at a later time.[84]

(Continued from previous page) ─────────────────────

the regulation of broadcasters under Title III of the Communications Act, we do not interpret this provision as prohibiting the Commission from reexamining and revising the national audience reach cap or the UHF discount. We think this provision is most reasonably interpreted as a congressional directive that the Commission not decline to enforce against any person or entity the stricter national cap that Congress required the Commission to adopt. After all, the statute was a response to the Commission's relaxation of the cap, and Congress directed the Commission to instead adopt a more stringent cap. There is nothing in the CAA that suggests Congress intended to prevent the Commission from tightening the cap, repealing the UHF discount, or otherwise changing its rules at a later date.

[78] 47 U.S.C. § 154(i).

[79] *Id.* § 303(r). *See also Sports Blackout Rule,* Report and Order, 29 FCC Rcd 12053, 12058, para. 9 (2014) (*Sports Blackout Order*) (finding that, despite a statute stating that the Commission "shall" apply the sports blackout rule to direct broadcast satellite and online video service, the Commission could repeal the rule under its general rulemaking power to review its rules and modify or repeal them as it deems appropriate).

[80] *See, e.g., Cincinnati Bell Tel. Co. v. FCC,* 69 F.3d 752, 767 (6th Cir. 1995), citing *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C. Cir. 1992), *cert. denied,* 506 U.S. 816 (1992) (*Bechtel*) ("[W]here the factual assumptions which support an agency rule are no longer valid, agencies ordinarily must reexamine their approach."); *Geller v. F.C.C.,* 610 F.2d 973, 979 (D.C. Cir. 1979) ("[An] agency cannot sidestep a reexamination of particular regulations when . . . circumstances make that course imperative.").

[81] *Bechtel,* 957 F.2d at 881 (quoting *WWHT, Inc. v. FCC,* 656 F.2d 807, 819 (D.C. Cir 1981)). *See also Sports Blackout Order,* 29 FCC Rcd at 12061-12068, paras. 13-19 (describing shift of distribution rights from leagues to teams, change from gate receipts to television revenues as primary source of NFL revenue, and reduction in NFL blackouts as factual differences making sports blackout rules no longer relevant).

[82] Fox Comments at 5; Sinclair Comments at 5.

[83] *See, e.g.,* Sinclair Comments at 5; Fox Comments at 4-6; Univision Comments at 13; ION Comments at 11-12; Trinity Comments at 1-5. Several times, the CAA refers to "the 39 percent national audience reach limitation." *See supra* note 76.

[84] *See AFL-CIO v. Brock,* 835 F.2d 912, 916 (D.C. Cir. 1987) ("To freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place."). Further, Sinclair's appeal to the legislative history of the 1996 legislation raising the cap from 25 percent to 35 percent, *see supra* note 70, is inapt because it says nothing about congressional intent when Congress enacted legislation in 2004 to lower the Commission's 45 percent cap to 39 percent.

23.     Moreover, we disagree with commenters' suggestion that the CAA's legislative history somehow supports a conclusion that Congress fully considered either the UHF discount or the effect of the – then future – DTV transition.[85]  The history of this immense, omnibus bill does not reflect any consideration of the UHF discount or its potential elimination.  There is no basis for the assumption that Congress, in overruling the Commission's decision to raise the national audience reach cap to 45 percent and mandating it be moved back down to 39 percent, did so with the expectation that the Commission would indefinitely maintain the UHF discount, especially given that post-DTV transition there is no technological basis for the UHF discount.[86]  We note further that, when Congress chose to supersede the Commission's action and revise the national audience reach cap down to 39 percent, it was on notice of the Commission's intent to phase out the discount, which the Commission had expressed in 1998 and again in 2002.  Congress was also aware, of course, of the Commission's broad authority – indeed, its obligation – to reevaluate its rules periodically and revise any that no longer serve the public interest.  It could have foreclosed the Commission from ever revising the national audience reach cap or the UHF discount by making the national cap and the UHF discount a statutory restriction or by otherwise withdrawing Commission authority to modify the cap or the UHF discount.  It did not do so, opting instead for the limited measure that reduced the cap from 45 percent to 39 percent and relieving the Commission of the obligation to reevaluate the national audience reach cap in the mandated quadrennial ownership review.[87]  The Public Interest Commenters argue that these actions suggest Congress's intent was to prevent excessive consolidation in the broadcast market, and we agree.[88]  In fact, as discussed below, operation of the analog-era discount after the DTV transition effectively allows some broadcasters with UHF stations to reach far more than the 45 percent of the national audience that Congress thought too high.

24.     Our interpretation of the CAA is consistent with the conclusion of the Third Circuit.  The court explained in *Prometheus I*, that, although Congress excluded the national audience reach cap from the quadrennial review requirement under Section 202(h), it did not foreclose Commission action to review or modify the UHF discount in a separate context.[89]

**B.     Elimination of the UHF Discount**

25.     The *Notice* tentatively concluded that the historical justification for the UHF discount no longer exists and the rule is obsolete and should be eliminated.  Many commenters support the Commission's tentative conclusions.  Several commenters agree that television broadcasting in the UHF

---

[85] In 2004, when Congress lowered the national audience reach cap in the CAA, the digital transition was still several years away and was designed to progress on a gradual, market-by-market basis.  Congress therefore could not have evaluated the impact of the DTV transition on the UHF discount.  *See* 47 U.S.C. § 309(j)(14)(A)-(B) (2004) (stating that only television broadcast stations meeting certain criteria could broadcast in an analog format beyond December 31, 2006).  As noted above, later in 2006 the gradual transition approach was replaced with a hard deadline for transition by June 12, 2009.  *See supra* note 33.

[86] The legislative history from the 1996 Act cited by Sinclair simply reinforces the notion that the UHF discount "appropriately reflect[ed] the technical and economic handicaps applicable to UHF facilities" at that time.  *See supra* note 70.

[87] *See Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

[88] Public Interest Commenters Reply at 2-3.

[89] *Prometheus I*, 373 F.3d at 397 ("Although we find that the UHF discount is insulated from this and future periodic review requirements, we do not intend our decision to foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h).").  *See also* Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.

band is no longer technically inferior to operations in the VHF band.[90]  For example, Block asserts that the UHF discount is an "outdated relic of the old analog broadcasting system," because UHF stations are now more desirable than VHF stations for digital broadcasting.[91]  Free Press also agrees that the DTV transition eliminated the technical disadvantages faced by UHF stations and notes that, when the UHF discount was adopted, diminished signal coverage greatly impacted broadcasters as they depended more on over-the-air signal coverage than they do today.[92]  Given that UHF stations no longer suffer from weaker signals and smaller audience reach, and are less dependent today on over-the-air coverage, Free Press argues that UHF station owners no longer need the UHF discount to remain viable and competitive.[93]

26.    Notably, commenters in this proceeding have not presented evidence of any existing technical limitations that render digital UHF stations inferior to digital VHF stations.  As Public Interest Commenters state, "[n]ot a single commenter contended that the original justification for the UHF discount is still valid."[94]  At best, ION asserts that several years of signal parity does not remedy the disparities between UHF and VHF stations, citing VHF commercial and economic advantages acquired during the analog era.[95]  To the contrary, several commenters support our conclusion that the DTV transition eliminated the technical disparities between UHF and VHF services that existed in the analog world.[96]

27.    Other commenters argue that, aside from any technological considerations that may originally have justified the UHF discount, the discount remains necessary today to promote competition, localism, and diversity.[97]  For example, Sinclair asserts that the UHF discount helps non-network broadcast groups compete with stations owned and operated by the major broadcast networks, which typically have higher ratings and continue to benefit from historical viewing patterns.[98]  Additionally, ION argues that eliminating the UHF discount will stifle the creation of new networks, like those built by ION, Univision, and Trinity, thus reducing competition and diversity.[99]  In response, Free Press, WGAW,

---

[90] *See, e.g.*, Block Comments at 1-3; Free Press Comments at 3; CCA Comments at 1; WGAW Comments at 3-4; Public Interest Commenters Reply at 3; Letter from Ross Lieberman, Senior Vice President of Government Affairs, American Cable Association (ACA), to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1-3 (filed August 2, 2016) (ACA August 2, 2016, *Ex Parte* Letter).

[91] Block Comments at 1-2; *see also* CCA Comments at 1; ACA August 2, 2016, *Ex Parte* Letter at 2.  Block further argues that large station groups have already exploited the UHF discount by purchasing dozens of UHF stations, driving their true national audience reach well above the national audience reach cap.  Therefore, Block argues, station owners no longer need incentives like the UHF discount to utilize the UHF band.  Block Comments at 2-3.

[92] Free Press Comments at 3, 6.  *See also* WGAW Comments at 3; ACA August 2, 2016, *Ex Parte* Letter at 2.

[93] Free Press Comments at 3.

[94] Public Interest Commenters Reply at 1.  *See also* ACA August 2, 2016, *Ex Parte* Letter at 2-3.

[95] ION Comments at 9-10; Letter from John R. Feore, Counsel to ION Media Networks, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 2 (filed July 15, 2016) (ION July 15, 2016, *Ex Parte* Letter).

[96] Free Press Comments at 3 (stating the digital transition eliminated the technical disparities of UHF stations); CCA Comments at 2 (asserting the UHF discount is a product of the analog era and no longer serves its purpose); WGAW Comments at 3 (noting the technical justification for the UHF discount is now obsolete); Block Comments at 2 (arguing UHF stations are more desirable than VHF stations for digital broadcasting); ACA August 2, 2016, *Ex Parte* Letter at 3 (claiming that the discount's factual justification is lost, and therefore it is no longer in the public interest and its retention by the Commission would be arbitrary and capricious).

[97] *See, e.g.*, Fox Comments at 13-18; ION Comments at 7-10; Univision Comments at 1; Sinclair Comments at 7-8.

[98] Sinclair Comments at 7-8.

[99] ION Comments at 9.

Block, and ACA assert that the UHF discount actually harms competition, localism, and diversity because it encourages media consolidation.[100]

28.    The record is absolutely clear:  UHF stations are no longer technically inferior in any way to VHF stations.  Therefore, we find that the DTV transition has rendered the UHF discount technically obsolete, and we hereby eliminate it from the calculation of the national audience reach cap.  The UHF discount was forged in an analog world to address an analog coverage deficiency.[101]  Today, in a digital world, there is no remaining technical justification for the UHF discount.  In fact, solely as a result of the DTV transition, the national cap is effectively 78 percent for a station group that includes only UHF stations, and for any station group that includes a UHF station, the effective national cap now exceeds the 39 percent level that Congress directed the Commission to establish.  Rather than offsetting an actual service limitation or reflecting a disparity in signal coverage, the UHF discount serves only to confer a factually unwarranted benefit on owners of UHF television stations that undermines the purpose of the national audience reach cap.  Furthermore, the Commission's ongoing experience reviewing media transactions after the DTV transition date indicates that failure to correct the distortion that the UHF discount causes in the calculation of the national audience reach as a result of the DTV transition creates an ongoing potential that additional transactions could undermine the national audience reach cap.

29.    At the time the UHF discount was established, analog UHF television stations were demonstrably inferior to VHF stations, with weaker signals and a smaller audience reach.[102]  The UHF discount ensured that UHF stations were not presumed to reach a larger audience than they actually reached.[103]  Thirty years after its adoption, however, it is clear that the UHF discount cannot be justified in the digital world.  As discussed above, the UHF discount was intended explicitly to recognize and compensate for the inferior coverage and smaller viewership that analog UHF stations suffered in comparison to analog VHF stations.[104]  While that was necessary in the mid-1980s, the Commission soon found that the disparity was unlikely to exist in perpetuity.  Further, three decades ago roughly 60 percent of U.S. television households received programming exclusively over-the-air, while according to the most recent Nielsen data, approximately 11.5 percent, or about 13.3 million television households, were broadcast-only.[105]

30.    As early as 1988 the Commission noted that the disparities between UHF and VHF services had begun to decrease.[106]  And, as the disparity between the two services eroded during the 1980s and 1990s, the Commission repealed a number of rules and policies that had previously treated UHF

---

[100] Free Press Comments at 4-5; WGAW Comments at 4-7; Block Comments at 2; ACA August 2, 2016, *Ex Parte* Letter at 3.

[101] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 93, para. 43 ("[W]e find that while there has been demonstrable progress in the viability of UHF television, the inherent physical limitations of this medium should be reflected in our national multiple ownership rules.").  *See also 2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 585 ("[T]he discount was enacted because UHF stations were competitively disadvantaged by weaker signals and smaller household reach than VHF stations.").

[102] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 92-94, paras. 42-44.

[103] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 586 (discussing data showing that UHF stations reached between 56 percent and 61 percent and between 35.7 percent and 78.2 percent of the service area of VHF stations owned by the same licensee in the same markets).

[104] *See supra* para. 5.

[105] Broadcasting Cablecasting Yearbook 1985 at A-2; Nielsen, *2015-2016 Universe Estimates: National Media Related Universe Estimates* (excel spreadsheet), Feb. 1, 2016.

[106] *Policies Regarding Detrimental Effects of Proposed New Broadcast Stations on Existing Stations*, Report and Order, 3 FCC Rcd 638, 642, para. 27 (1988) (stating that "the former disparities between the UHF and VHF services have been largely eliminated") (*1988 UHF Impact Policy Order*).

stations differently, and occasionally more favorably, than their VHF counterparts.[107]  By the mid-1990s, the Commission went so far as to note that the disparities between UHF and VHF stations had been largely ameliorated and the ability of UHF stations to compete against VHF stations had greatly improved.[108]

31.     The most important change, however, occurred with the transition of television broadcasting to digital, which the Commission had long recognized would likely eliminate the inferiority of UHF channels.  As explained above, in the *1998 Biennial Review Order*, the Commission made clear its skepticism that the UHF discount would continue to have any relevance following the DTV transition.[109]  Even though the Commission ultimately decided to retain the UHF discount in the *1998 Biennial Review Order* because the digital transition was not yet complete, it indicated that the discount's days were numbered.[110]  At that time, the Commission discussed at length its expectation that the transition to digital broadcasting would potentially "rectify the UHF/VHF disparity" and that "the eventual modification or elimination of the discount for DTV [would] be appropriate."[111]

32.     In its subsequent *2002 Biennial Review Order*, the Commission determined that the issue was ripe and that the forthcoming DTV transition would substantially equalize UHF and VHF signals.[112]  The DTV transition has borne out the Commission's expectation.  As a result of the DTV transition, digital UHF television stations do not suffer from the same technical deficiencies that had characterized analog UHF stations in comparison to VHF facilities.

33.     UHF spectrum is now highly desirable in light of its superior propagation characteristics for digital television.[113]  ION notes that, since the 2009 DTV transition, 74 percent of the nation's television stations are now operating on UHF channels, and 80 percent of the aggregate television viewing population is served by UHF stations.[114]  As a result of the DTV transition, the number of UHF

---

[107] *See id.* at 639, 642, paras. 6, 26 (eliminating the UHF Impact Policy, which limited approval of new, or modifications to existing, VHF stations if the proposal would harm existing or potential UHF stations); *Review of the Prime Time Access Rule, Section 73.658(k) of the Commission's Rules*, Report and Order, 11 FCC Rcd 546, 546, 596-97, 601-02, paras. 1, 99-102, 113-15 (1995) (repealing Prime Time Access Rule, which prohibited network-affiliated television stations in the top 50 markets from broadcasting more than three hours of network programs during prime time hours and was designed to increase programming available to independent stations, including UHF stations) (*1995 Prime Time Access Rule Order*); *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 10 FCC Rcd 4538, 4542, paras. 1, 26 (1995) (repealing secondary affiliation rule, which required a third network seeking an affiliate in the market to offer its programming first to the independent station, often a UHF station) (*1995 Review of Television Broadcast Rules Order*).

[108] *Broadcast Television National Ownership Rules*, Notice of Proposed Rulemaking, 11 FCC Rcd 19949, 19954, para. 12 (1996) (stating "the UHF disparity has been ameliorated over the years") (*Broadcast Television National Ownership Rules NPRM*); *1995 Prime Time Access Rule Order*, 11 FCC Rcd at 597, para. 101 (noting "that the UHF signal disparity has been reduced, albeit not entirely"); *1995 Review of Television Broadcast Rules Order*, 10 FCC Rcd at 4542, para. 20 (stating that "[f]rom a technical perspective, the ability of the UHF television service to compete against VHF service, however, has improved in the 24 years since the secondary affiliation rule was adopted").

[109] *1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38.

[110] *Id.* at 11078-80, paras. 35-38.  *See also* Free Press Comments at 3.

[111] *1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38.

[112] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591.

[113] *Broadcast Innovation NPRM*, 25 FCC Rcd at 16511-13, paras. 42-45.

[114] ION Comments at 5.  In April 2010, Broadcasting & Cable noted that following the June 2009 DTV transition, "the majority of U.S. TV stations had moved to UHF channels, which are better suited to broadcasting digital television at lower power level." *Top 25 Station Groups: How They Were Ranked*, BROADCASTING & CABLE, Apr. 12, 2010, *at* http://www.broadcastingcable.com/file/10313-B_C_Top_25_Station_Groups.pdf?force=true (visited, (continued….)

stations increased by 221 stations and the number of VHF stations decreased by 204 stations, indicating that over 200 stations, or approximately 15 percent of the total number of commercial television stations, switched spectrum bands in favor of UHF as a result of the DTV transition.[115]  Notably, the DTV transition preserved station coverage, and in many cases, allowed stations to improve coverage by upgrading their facilities, maximizing power, and capitalizing on improved propagation of digital television signals.[116]  Therefore, stations have enhanced their coverage and audience reach as a result of the DTV transition, both because of the technical superiority of digital broadcasts on UHF channels and as a result of the chance to "maximize" their signal coverage during the transition.  The evidence clearly establishes that digital UHF operations do not suffer from the same technical limitations as analog UHF operations.  Additionally, this finding is consistent with past Commission decisions scrutinizing the necessity of the UHF discount and recognizing the increased economic viability and success of the UHF band.[117]

34.      Simply put, the UHF discount does not appropriately reflect the technical and economic reality of UHF facilities today.  And, in fact, the discount impedes the objectives of the national audience reach cap by effectively expanding the 39 percent cap even beyond the level that Congress determined was too high when it enacted the CCA.  Without any current technological justification, the continued application of the UHF discount distorts the calculation of a licensee's national audience reach and undermines the intent of the cap.  Continued application of the UHF discount seven years after the DTV transition has the absurd result of stretching the national audience reach cap to allow a station group to actually reach up to 78 percent of television households, dramatically raising the number of viewers that a station group can reach and thwarting the intent of the cap.[118]  The discount was intended to make the calculation of an owner's audience reach better reflect the reality of the audience the stations actually reached.  In the current circumstances, however, applying the discount creates a loophole that allows

(Continued from previous page)  ──────────────

June 21, 2016) (*2010 Top 25 Station Groups Chart*).  *See also* Paige Albiniak, *B&C's Top 25 Station Groups 2010*, BROADCASTING & CABLE, Apr. 12, 2010, *at* http://www.broadcastingcable.com/news/local-tv/bc%E2%80%99s-top-25-station-groups-2010/42271 (visited June 21, 2016) (*B&C's Top 25 Station Groups 2010*).

[115] *See Broadcast Station Totals as of December 31, 2008* (rel. Feb. 27, 2009) (listing 796 UHF commercial TV licenses and 582 VHF commercial TV licenses); *Broadcast Station Totals as of June 30, 2009* (rel. Sept. 4, 2009) (listing 1,017 UHF commercial TV licenses and 378 VHF commercial TV licenses).

[116] *See 1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38 ("[…] pursuant to Section 5009(c) of Pub. Law 106-113, 113 Stat. 1501, Appendix I (1999), the Commission, on December 7, 1999, issued a Public Notice giving DTV licensees until December 31, 1999, in which to file notice that they intend to seek maximization of their DTV service area.  One thousand three hundred and sixteen letters of notification manifesting the intent to file to maximize DTV stations' service areas were filed by that deadline.  Accordingly, DTV licensees, including those operating on UHF channels, have been given the opportunity to maximize their DTV coverage areas, and not merely replicate their analog coverage.").

[117] *See, e.g.*, *Broadcast Innovation NPRM*, 25 FCC Rcd at 16511, para. 42 (recognizing that UHF spectrum is highly desirable for flexible use); *Broadcast Television National Ownership Rules NPRM*, 11 FCC Rcd at 19954, para. 12 ("the UHF disparity has been ameliorated over the years"); *1995 Review of Television Broadcast Rules Order*, 10 FCC Rcd at 4542, para. 20 ("From a technical perspective, the ability of the UHF television service to compete against VHF service, however, has improved in the 24 years since the secondary affiliation rule was adopted.").  We note further that retention of the UHF discount would contradict past Commission actions to eliminate regulatory measures originally adopted to assist analog UHF stations.  *See supra* para. 30.

[118] This assumes all stations in the group broadcast on UHF channels.  *See, e.g.*, Public Interest Commenters Reply at 3.  Further, the Public Interest Commenters argue that the continued existence of an obsolete discount incentivizes station group owners to switch their VHF stations for UHF stations for the very purpose of avoiding the effects of the national audience reach cap, in which case the existence of the discount proactively undermines the rule.  *Id.* at 3-4.  *See also* ACA August 2, 2016, *Ex Parte* Letter at 2, stating that the UHF discount, "now gives owners of UHF stations an unfair advantage in the number of households their signal may lawfully reach and skews the broadcast marketplace."

owners to fail to count audience that the stations actually do reach. For example, prior to the DTV transition, a station group owner might have a theoretical audience reach of 39 percent, but, because some stations in the group operated using inferior analog UHF signals, the group could not actually reach all of that audience. So the UHF discount reasonably allowed the station group owner to adjust the audience reach calculation to a lower percentage to reflect that reality better. Immediately after the DTV transition, however, the same UHF stations in the group would experience improved audience reach as a function of the technical superiority of digital broadcasts on UHF channels. The station group's actual national audience reach would now equal or even exceed 39 percent, as its stations would, in fact, reach the television households in their market areas, and a discount to offset a spectral coverage deficiency would no longer be warranted. Continued application of the antiquated UHF discount now has the unintended consequence of significantly discounting a station's actual audience reach for purposes of the rule when in reality the station's audience reach is not diminished at all by the use of UHF technology, but rather improved.[119]

35.     Additionally, as a result of the DTV transition, many stations that were broadcasting on VHF channels at the time the 39 percent cap was instituted have shifted to UHF channels. Despite having signal coverage that is equal to, or even better than, its previous VHF channel, the former VHF station now receives – for the first time – the benefit of the UHF discount, *i.e.*, a 50 percent reduction in the audience reach attributed to the station, all based on a discount intended to offset the inferiority of *analog* UHF signals. For instance, a licensee that traded an analog VHF station for a digital UHF station will now appear to have room to acquire additional stations under the 39 percent cap simply by virtue of having changed spectrum, even though the number of stations owned by the licensee and the audience reached by those stations remain the same. Such a result serves as an unwarranted windfall for stations that migrated from VHF to UHF in the DTV transition, in light of the general technical superiority of the digital UHF channels.[120]

36.     For example, in 2009, just prior to the DTV transition, Fox owned 27 stations with a total national audience reach of 37.22 percent before application of the UHF discount and 31.20 percent after application of the UHF discount.[121] In 2010, immediately after the DTV transition, Fox continued to own 27 stations with a total national audience reach of 37.10 percent before application of the UHF

---

[119] Furthermore, as demonstrated by the example above, the digital UHF station very likely would have greater signal coverage and reach a greater number of viewers because of the technological innovations of the DTV transition. Despite this fact, the continued application of the analog-era UHF discount would reduce the audience reach as calculated for purposes of the national audience reach cap for this station by 50 percent. *See supra* para. 33.

[120] Even after the DTV transition, a number of stations that initially elected to operate on a VHF channel sought to relocate to a UHF channel to resolve technical difficulties encountered in broadcasting digitally on a VHF channel. *See, e.g.*, *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations. (Panama City, Florida)*, Report and Order, 26 FCC Rcd 14415 (Chief, Video Division, MB 2011) (substituting channel 18 for channel 7 for Gray Television Licensee, LLC); *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations. (Nashville, Tennessee)*, Report and Order, 26 FCC Rcd 7677 (Chief, Video Division, MB 2011) (substituting channel 25 for channel 5 for NewsChannel 5 Network, LLC); *Amendment of Section 73.622(i), Final DTV Table of Allotments, Television Broadcast Stations. (Oklahoma City, Oklahoma)*, Report and Order, 25 FCC Rcd 2276 (Associate Chief, Video Division, MB 2010) (substituting channel 39 for channel 9 for Griffin Licensing, L.L.C.). *See also* Block Comments at 2 (noting many broadcasters switched from VHF to UHF channels after the DTV transition); *Top Station Groups Stay the Course*, TVNewsCheck, Apr. 7, 2010, http://www.tvnewscheck.com/article/41240/top-station-groups-stay-the-course#top-group-5 (stating the UHF discount no longer makes sense given that following the DTV transition most stations are UHF stations) (visited June 20, 2016).

[121] Paige Albiniak, *NAB 2009: Top 25 Station Groups*, Broadcasting & Cable, Apr. 19, 2009, at http://www.broadcastingcable.com/news/programming/nab-2009-top-25-station-groups/34555 (visited June 21, 2016).

discount.[122]  However, because five of Fox's stations switched from analog VHF channels to digital UHF channels in the transition, Fox's national audience reach calculation suddenly decreased with the benefit of the UHF discount, which allowed the station group to calculate its audience reach as only 24.75 percent – despite the fact that Fox still owned the same number of stations in the same markets reaching the same audiences.[123]  Although only five of Fox's stations switched from analog VHF to digital UHF channels in the DTV transition, these stations were all located in the top 10 DMAs, which account for a significant percentage of the television households in the nation.[124]  As a result, reducing the national audience reach by 50 percent for just a handful of stations in these larger markets had the effect of greatly reducing Fox's national audience reach calculation and potentially allowing significant additional consolidation, although it had no effect on its actual national audience reach.  This example demonstrates the absurd results created by the continued existence of the discount.

　　　　37.　　Some commenters note that in 2003 the Commission retained the UHF discount for stations not owned by the Big Four networks and indicated the Commission would "examine the extent of the competitive disparity between UHF and VHF stations as well as the impact on the entry and viability of new broadcast networks."[125]  These commenters thus claim that the Commission must consider not only the technological disparity between UHF and VHF, but the competitive disparity as well.[126]  But any competitive disparity between UHF and VHF flowed from the technological disparity.[127]  As we have detailed above, following the transition to DTV, UHF stations are no longer competitively disadvantaged as compared to VHF stations.  The competitive disadvantages suffered by analog UHF stations – namely weaker signals, smaller household reach, greater electricity costs, and potentially reduced carriage by cable systems as compared to VHF stations[128] – have been resolved by the transition to digital broadcasting.  Further, the record does not reflect evidence of any existing competitive disparity resulting from the continued deficiency of UHF signals.  For example, no party has proffered evidence that advertisers routinely discount the prices paid for advertising on UHF stations versus VHF stations, as

---

[122] *2010 Top 25 Station Groups Chart*; *see also B&C's Top 25 Station Groups 2010*.

[123] *See 2010 Top 25 Station Groups Chart*; R.R. Bowker, *Broadcasting & Cable Yearbook 2010*, "Section B, Broadcast Television" (2009); R.R. Bowker, *Broadcasting & Cable Yearbook 2009*, "Section B, Broadcast Television" (2008) (providing group ownership and station listings).

[124] *Id.*

[125] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591; *see also* ION Comments at 10-11, Letter from John R. Feore, Counsel to ION Media Networks, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed August 15, 2016) (ION August 15, 2016, *Ex Parte* Letter); Tribune Reply at 3, Trinity July 29, 2016, *Ex Parte* Letter at 2; Sinclair Comments at 7-8.

[126] Despite the technical superiority of digital UHF stations, ION argues the UHF discount is still necessary because the DTV transition did not remedy the longstanding economic disadvantages of UHF stations.  ION Comments at 9-11; ION July 15, 2016, *Ex Parte* Letter at 2.  *See also* Sinclair Comments at 7-8 (noting continued competitive disadvantages of UHF stations).  Contrary to ION's claims, the Commission in 2003 made no affirmative decision to preserve the UHF discount for stations not owned and operated by the Big Four networks, and certainly did not do so because "those stations are most likely to continue suffering from persistent economic handicap afflicting UHF stations," as ION argues.  ION Comments at 10; *see also id.* at 6-9.  The Commission clearly articulated that the UHF discount was predicated on the competitive disparity arising from the technical differences between the two types of channels, and merely deferred a decision on eliminating the discount, stating that it would "propos[e] a phased-in elimination of the discount when DTV transition is near completion."  *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591.  With the advent of a hard deadline for the transition and the universal switch of all full-power stations to DTV in 2009, however, the need and logic for a gradual elimination of the UHF discount evaporated, along with the basis for the discount.  There is even less need for the discount seven years after the transition.

[127] *2002 Biennial Review Order*, 18 FCC Rcd at 13845-46, paras. 585-88.

[128] *Id.*

commenters alleged in 2003.[129]  Thus, we find no evidence that UHF stations today face a competitive disparity vis-à-vis VHF stations.  In fact, as we note above, a number of former analog VHF stations chose to operate on UHF channels, further belying the suggestion that a competitive disparity persists between the two types of channels.  Further, the Commission has eliminated the historic steep discount in annual regulatory fees assessed for UHF stations, combining UHF and VHF stations into a single fee category beginning in Fiscal Year 2014, thereby eliminating a distinction based on the historical disadvantages of UHF.[130]

38.     Of course, this is not to say that all *stations* are now competitive equals.  Disparities continue to exist between stations in terms of viewership, advertising revenue, retransmission consent fees, and programming, to name a few.  But these competitive disparities are not the result of any current technical differences between UHF and VHF stations.  Because UHF stations are no longer technologically disadvantaged, they can now compete effectively in a market with VHF stations.  Disparities between stations today are the result of market competition, programming choices, network affiliation, and capitalization.  Moreover, we do not believe that retention of the UHF discount would resolve any of these competitive differences.[131]  Finally, in response to Sinclair's claim that removing the discount would frustrate the original purpose of the national cap, *i.e.*, to "preserv[e] the balance of power between networks and affiliates,"[132] we note that removing the discount will prevent networks from expanding their reach, and our grandfathering regime, discussed below, will ensure that broadcasters that otherwise would exceed the cap after the discount is eliminated – none of which are the Big Four networks – will be grandfathered.

39.     Some commenters also note that the *2002 Biennial Review Order* found that "the UHF discount continues to be necessary to promote entry and competition among broadcast networks."[133]  First, when the Commission made that finding, the DTV transition was still a number of years in the future.[134]  Second, contrary to the Commission's observations nearly a decade and a half ago, we do not see that the UHF discount is leading to the creation of new broadcast networks today.  The record contains no evidence that new broadcast networks are being built today by assembling a national station group of UHF broadcast stations.[135]  Similarly, our most recent annual report on the state of competition among video providers does not reflect a trend of emerging UHF broadcast networks.  Instead, it appears that new programming networks are emerging as cable networks, online video programmers, and multi-cast digital networks – methods that do not rely on the UHF discount.[136]  Therefore, we do not believe that

---

[129] *2002 Biennial Review Order*, 18 FCC Rcd at 13846, para. 588 n.1226.

[130] *See, e.g.*, *Assessment and Collection of Regulatory Fees for Fiscal Year 2013*, Report and Order, 28 FCC Rcd 12351, 12361-62, paras. 30 (2013) ("Historically, analog VHF channels (channels 1-13) were coveted for their greater prestige and larger audience, and thus the regulatory fees assessed on VHF stations were higher than regulatory fees assessed for UHF (channels 14 and above) stations in the same market area.").

[131] While ION argues that four years of signal parity is not enough to remedy the economic disparity between historically VHF stations and historically UHF stations, it fails to demonstrate how retention of the UHF discount would remedy the institutionalized economic disparity that it sees.  *See* ION Comments at 9-10.  Further, it has now been seven years since the DTV transition.  *See supra* para. 34.

[132] Sinclair Comments at 7 & n.32 (quoting *2002 Biennial Review Order*, 18 FCC Rcd at 13842, para. 578).

[133] *2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 586; *see also* Tribune Reply at 3, ION Comments at 9, Sinclair Comments at 7; Trinity July 29, 2016, *Ex Parte* Letter at 2 & n.5.

[134] *See supra* notes 33 & 85.

[135] Free Press argues that the UHF discount does not promote new entrants because it "reduces the number of stations available to new entrants and reduces the number of competitors nationwide." Free Press Comments at 4. *See also* WGAW Comments at 4; Block Comments at 2.

the record in this proceeding warrants a conclusion that perpetuation of the UHF discount would foster the creation of new broadcast networks.[137]

40.    While several commenters argue that we should reexamine the national audience reach cap in conjunction with our examination of the UHF discount,[138] reexamining the cap is not within the scope of the *Notice*, and we decline to initiate a further rulemaking proceeding at this time for that purpose.[139]  As discussed above, we do not agree with commenters that eliminating the UHF discount also requires an examination of the national audience reach cap.[140]  No party has presented persuasive reasons for revisiting the national cap at this time, and doing so would be far more complex than our decision today to eliminate the UHF discount, which we have concluded clearly lacks any remaining justification.  Initiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap, which is the media ownership limit that Congress examined most recently, would only delay the correction of audience reach calculations necessitated by the DTV transition.  Delay would unnecessarily complicate our efforts to bring the cap back into alignment with its stated level as broadcasters continue to increase their reach.  Continued application of the discount absent its technical justification simply distorts the operation of the national audience reach cap by exempting the portions of the audience that are receiving a signal from being counted and allowing licensees that operate on UHF channels to reach more than 39 percent of viewers nationwide.[141]  Removal of the analog-era discount

(Continued from previous page)

[136] *See, e.g.*, *Annual Assessment for the Status of Competition in the Market for the Delivery of Video Programming*, Seventeenth Report, MB Docket No. 15-158, 31 FCC Rcd 4472, 4494, 44495-99, 4499-4500, 4517, 4542-43, 4543-50, 4451-52, paras. 57, 59-67, 69-71, 103, 168-169, 171-182, 186-187 (2016).  *See also* Univision Comments at 14 (noting that major networks are increasingly challenged by upstart networks, premium cable channels, and online video); Trinity July 29, 2016, *Ex Parte* Letter at 3 (describing new programming Trinity delivers by multi-casting).

[137] Indeed, ION, Tribune, and Trinity point to no such new emerging UHF broadcast networks.  Rather, the commenters appear more concerned with the preservation of their own existing station combinations, which we address in the discussion on the grandfathering of existing broadcast station combinations below.  *See infra* paras. 41-53.

[138] NAB Comments at 2-4; Letter from Rick Kaplan, General Counsel and Executive Vice President, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 14, 2016) (NAB June 14, 2016, *Ex Parte* Letter); Letter from Rick Kaplan, General Counsel and Executive Vice President, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 20, 2016) (NAB June 20, 2016, *Ex Parte* Letter); Letter from Rick Kaplan, General Counsel and Executive Vice President, and Jerianne Timmerman, Senior Vice President and Deputy General Counsel, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 23, 2016) (NAB June 23, 2016, *Ex Parte* Letter); Fox Comments at 13-21; Fox June 9, 2016, *Ex Parte* Letter at 1; Sinclair Comments at 8-12; Univision Comments at 13-15; ION Comments at 14-16.

[139] In this regard, our elimination of the UHF discount is unlike our adoption of the attribution rule for television joint sales agreements (TV JSAs), which the Third Circuit held was contrary to our periodic review obligation under section 202(h).  *Prometheus Radio Project v. FCC*, 824 F.3d 33, 59 (3d Cir. 2016) ("[T]he Commission cannot expand its attribution policies for an ownership rule to which § 202(h) applies unless it has, within the previous four years, fulfilled its obligation to review that rule and determine whether it is in the public interest.").  The Local TV ownership rule clearly is subject to periodic review under section 202(h), whereas the national television ownership cap is not subject to that obligation.  In addition, unlike our action on TV JSAs, we are grandfathering station groups that will exceed the national cap after we eliminate the UHF discount, so elimination of the UHF discount will not require divestitures by station owners.  Finally, as discussed above, retention of the UHF discount is indefensible, regardless of the level of the cap, because it is irrational in light of the digital transition.  Therefore, we reject the recent contentions of NAB and Fox that *Prometheus III* supports a conclusion that we cannot eliminate the UHF discount separately from a review of the national audience reach cap.  *See* NAB June 20, 2016, *Ex Parte* Letter at 2-3; NAB June 23, 2016, *Ex Parte* Letter at 2, 3; Fox June 9, 2016, *Ex Parte* Letter at 2.

[140] *See supra* paras. 20-21.

[141] As discussed above, following the DTV transition, many stations switched from VHF stations to UHF stations, and their calculated reach decreased as a result of the UHF discount.  *See supra* paras. 33, 35.

thus maintains the efficacy of the national cap.[142]  Although we do not foreclose the possibility of examining the national audience reach cap in the future, we find it is appropriate to take action now to address the effects of the DTV transition by eliminating the UHF discount.

**C.    Grandfathering of Existing Broadcast Station Combinations**

41.    In the *Notice*, the Commission recognized that elimination of the UHF discount would affect the calculation of the national audience reach for broadcast station groups with UHF stations.  The Commission suggested, however, that only a small number of broadcast station ownership groups approach the 39 percent national audience reach cap and only a few might exceed the cap if the UHF discount were eliminated.  Therefore, the Commission proposed to grandfather existing broadcast station groups to the extent that they exceeded the 39 percent national audience reach cap solely as a result of the termination of the UHF discount rule as of the date of the release of the *Notice* in this proceeding, which occurred on September 26, 2013.[143]  The Commission proposed similarly to grandfather station combinations for which applications were pending with the Commission or which had received Commission approval but were not yet consummated at the time the *Notice* was released.  The Commission proposed further that, if a grandfathered ownership group was subsequently assigned or transferred, then it would be required to comply with the national television ownership rule in existence at the time of the assignment or transfer.[144]

42.    A majority of commenters agree that the Commission should offer some kind of grandfathering to existing station combinations, although parties differ as to the form that grandfathering should take.  Block and ACA generally supported the form of grandfathering proposed in the *Notice*.[145]

43.    Sinclair, ION, and Univision argue that the grandfathering date should be the adoption date of this *Order*, not the date the *Notice* was released.[146]  Sinclair and ION argue that basing grandfathering on the date of the Order would provide broadcasters with the necessary time to complete contemplated deals without altering business plans.[147]  Sinclair asserts that this is the only fair approach, and that an earlier grandfathering cutoff would disrupt settled expectations, because broadcasters who entered into transactions after the date of the *Notice* did so in reliance on existing rules.[148]  Univision contends that the proposed grandfathering date is retroactive and penalizes broadcasters, especially those station groups like Univision who were UHF pioneers.[149]

44.    Sinclair argues alternatively that all UHF stations acquired, or for which an application to acquire was pending, prior to the date the discount is eliminated from our rules should be grandfathered until the station is sold.[150]  The result of this proposal would be that a UHF station owned prior to the elimination of the discount would be discounted for purposes of calculating a station group's compliance with the national audience reach cap until the owner sells the station, while newly acquired stations would

---

[142] *See supra* para. 34.

[143] *Notice*, 28 FCC Rcd at 14331, para. 20.

[144] *Id.* at 14331-32, para. 20.

[145] Block Comments at 3; ACA August 2, 2016, *Ex Parte* Letter at 4.  Block emphasizes though that any grandfathering rule must prevent broadcasters from acquiring more desirable UHF stations at a discounted ownership level and argues that broadcasters who have acquired UHF stations since the DTV transition should not receive grandfathering.  Block Comments at 3.

[146] Sinclair Comments at 12-13; ION Comments at 17-21; Univision Comments at 7-10.

[147] Sinclair Comments at 12-13; ION Comments at 21.

[148] Sinclair Comments at 12-13.

[149] Univision Comments at 9-10.

[150] Sinclair Comments at 14-15.

not be discounted.[151]  In effect, Sinclair is proposing to grandfather all station groups at their current national audience reach with the UHF discount in effect, instead of grandfathering just those station groups that would exceed the 39 percent cap due to the elimination of the UHF discount.[152]

45.     In addition, ION, Univision, Tribune, and Trinity – owners of the only station groups that will be over the current national ownership cap absent the UHF discount – contend that the Commission should adopt grandfathering rules to preserve the diversity and competition gains achieved by UHF broadcasters.  They advocate permitting the assignment or transfer of UHF station combinations with the UHF discount intact to future purchasers.[153]  In the event the Commission does not adopt a transferable grandfathering approach, Univision asks that a waiver mechanism be established that allows a broadcast group exceeding the national audience reach cap due to the elimination of the discount to demonstrate the importance of keeping the station portfolio intact.  Univision also requests that a station group be presumptively entitled to a waiver if it enters into a corporate reorganization that does not result in an increase in the group's audience reach.[154]

46.     On the other hand, some commenters do not support any grandfathering at all or believe a more limited grandfathering regime should be offered than what the Commission proposed in the *Notice*.[155]  Specifically, Free Press asks the Commission to forego grandfathering and instead require broadcast station groups that exceed the 39 percent audience reach cap as a result of the elimination of the UHF discount to divest stations in order to comply with the cap within 18 months.[156]  Similarly, the Public Interest Commenters oppose any grandfathering of current station combinations that exceed the cap without the discount.[157]  In the alternative, the Public Interest Commenters oppose the adoption of Sinclair's proposal to discount a station's audience reach until the station is sold.[158]

47.     We adopt the proposal for grandfathering reflected in the *Notice*.  We will grandfather broadcast station ownership groups that would exceed the 39 percent national audience reach cap as a result of the elimination of the UHF discount as of September 26, 2013, *i.e.*, the date of the *Notice*.  As we further proposed,[159] we also grandfather proposed station combinations for which an assignment or transfer application was pending with the Commission or that were part of a transaction that had received Commission approval as of that date if such station groups would otherwise exceed the cap.  We will require any grandfathered ownership combination subsequently assigned or transferred to comply with the national audience reach cap in existence at the time of the transfer of control or assignment of license.  We find that these provisions provide an appropriate balance between the valid expectations of broadcast station ownership groups who exceed the cap solely as a result of the elimination of the UHF discount and the goals and purposes of the 39 percent national audience reach cap.

48.     We note that there are no broadcasters that will exceed the national cap following the elimination of the UHF discount with a combination that will not be fully grandfathered by today's decision.  We note further that no broadcast transactions since the release of the *Notice* have resulted in an

---

[151] *Id.* at 14.

[152] *Id.* at 14-15.

[153] ION Comments at 21-23; ION July 15, 2016, *Ex Parte* Letter at 3; Univision Comments at 3-7; Tribune Reply at 4-7; Trinity July 29, 2016, *Ex Parte* Letter at 4.

[154] Univision Comments at 10-12.

[155] Free Press Comments 6-7; Public Interest Commenters Reply at 9-10; WGAW Comments at 6.

[156] Free Press Comments at 6-7.

[157] Public Interest Commenters Reply at 9.

[158] *Id.* at 9-10.

[159] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

entity exceeding the national ownership cap.  Thus, as a practical matter, there is no actual difference in grandfathering as the date of the date of the *Notice* or the date of this *Report and Order*.  Despite the claims of Fox, the Commission has continued to evaluate and approve broadcast transaction applications during the pendency of this proceeding.[160]  The grandfathering proposal we adopt today protects the existing ownership structure as of the release of this *Report and Order* for all broadcast television station groups that will exceed the national audience reach cap upon the elimination of the UHF discount.  Given the long history of notice that the UHF discount would be eliminated following the DTV transition and the potential for significant distortion of the national audience reach cap – indeed, the potential to double the national cap – we believe that the decision to use the date of the *Notice* as the grandfathering date is fully supported, as proposed in the *Notice,* and best serves the public interest.

49.    We find that the date of the *Notice* is the proper cut-off for grandfathering, consistent with previous Commission decisions.[161]  We do not believe, as Sinclair argues, that our decision not to grandfather transactions entered into after the date of the *Notice* disrupts settled expectations.  The release date of the *Notice* was when the Commission gave clear notice that it intended to eliminate the UHF discount in calculating the national audience reach for broadcast television station groups.  In addition, the grandfathering of interests in connection with the "equity/debt plus" rule and the attribution of Local Marketing Agreements (LMAs) each used the date of the notice in those proceedings as the cut-off date.[162]  Therefore, we are not persuaded to designate the adoption date of this *Report and Order* as the grandfathering date for the UHF discount as some commenters request.  Doing so would have given

---

[160] Fox Comments at 23-26.  *See also Applications of Local TV Holdings, LLC, Tribune Broadcasting Co. II, LLC & Dreamcatcher Broadcasting , LLC for Consent to Transfer of Control of Certain Licensee Subsidiaries of Local TV Holdings, LLC*, Memorandum Opinion and Order, 28 FCC Rcd 16850 (MB 2013).

[161] In its comments, ION attempts to distinguish the Commission precedent we cite at note 162 *infra* from our grandfathering proposal in this proceeding, arguing that UHF broadcasters lacked sufficient notice of the possible elimination of the UHF discount.  *See* ION Comments at 19-21; Univision, Trinity, and ION August 15, 2016, *Ex Parte* Letter at 1 (claiming that they acquired the "vast majority" of their UHF stations long before the Commission showed an interest in eliminating it).  ION contends that eliminating the UHF discount reflects a reversal of a nearly 30-year-old rule that is central to several companies' business planning and was upheld by the Commission and endorsed by Congress less than a decade ago.  ION Comments at 19.  However, as set out above, in 1996 and 1998, the Commission stated that any entity that acquired stations after the 1996 Act and complied with the national audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's action on the UHF discount.  *See supra* para. 7 & note 25.  Additionally, as noted above, the Commission as early as 1992 anticipated the possibility that the transition to digital television would obviate the need for the UHF discount.  *See supra* note 24.  We note that from 1995 to 1999, Paxson Communications Corporation, ION's predecessor, continued to acquire UHF stations and grew significantly.  *See* Television & Cable Factbook, Stations A-1384 (Vol. 63, 1995 ed.); Television & Cable Factbook, Stations A-1386 (Vol. 64, 1996 ed.); Television & Cable Factbook, Stations A-1429 (Vol. 65, 1997 ed.); Television & Cable Factbook, Stations A-1464 (Vol. 66, 1998 ed.); Television & Cable Factbook, Stations A-1450 (Vol. 67, 1999 ed.) (listing number of stations owned by TV station owners in each year).  Accordingly, ION was effectively on notice as early as 1996 that it would be subject to Commission action concerning the UHF discount.  ION also argues that, unlike previous grandfathering cases, our proposal excludes those broadcasters who had entered into transactions to acquire UHF stations as of the date of the *Notice*, but had not filed applications for approval of those transactions at the Commission.  ION Comments at 20.  As stated *supra* at para. 48 and *infra* at para. 501, our grandfathering decision addresses these concerns.

[162] *See Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, Report and Order, 14 FCC Rcd 12559, 12628-31, paras. 162-73 (1999) (determining interests acquired on or after the NPRM adoption date subject to the new equity/debt plus rules adopted in the order).  *See also Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12963, para. 139 (1999) (*Local TV Ownership Order*), clarified in Memorandum Opinion and Second Order on Reconsideration, 16 FCC Rcd 1067, 1085-88, paras. 50-55 (2001) (grandfathering TV LMAs entered before the release date of the NPRM and not those entered after that date), *aff'd in part and remanded in part sub nom. Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002).

Federal Communications Commission                    FCC 16-116

broadcasters an incentive to rush to engage in new transactions that could have diluted the effectiveness of our action to preserve the national audience reach cap by eliminating the outdated and technically unsupported UHF discount, perpetuating the distortive effect of this anachronistic regulation.

50.      Further, the industry has clearly been on notice for at least 20 years that the UHF discount would likely be eliminated following the transition to DTV.[163]  The Commission further stated in 2000, when the *1998 Biennial Review Order* was released, that it expected to eliminate the UHF discount after completion of the DTV transition.[164]  In addition, the Commission, in fact, previously decided to phase out the UHF discount, although that phase-out was rendered moot by congressional action.[165]  Also, as we discussed above, the technical basis for the discount is no longer valid, and its continued application has the potential to create market distortions.  The grandfathering proposal we adopt today ensures that, going forward, the national audience reach of broadcast station groups is reflected accurately in the broadcast television market while not penalizing those station groups who exceed the national audience reach cap solely as a result of eliminating the UHF discount.

51.      Contrary to Univision's contention, the grandfathering mechanism we adopt here does not make our decision to eliminate the UHF discount retroactive.  Today's action does not alter the past lawfulness of station combinations, does not impose any liability for having assembled station groups that would be prohibited going forward, and does not introduce any retrospective obligations for past conduct.[166]  And as noted above, by grandfathering existing station groups that would exceed the national audience reach cap without the continued benefit of the UHF discount as of the date of the *Notice*, we are specifically protecting all existing broadcast television station ownership combinations that would otherwise exceed the cap from the future effect of this change, even though application of the revised rule to them would not be considered retroactive.

52.      ION and Trinity urge the Commission to adopt permanent grandfathering of station groups, such as its own, that resulted in the creation of a new broadcast network.[167]  We conclude, however, that our decision not to grandfather the UHF discount for broadcast station ownership groups following a future assignment or transfer of control, as proposed in the *Notice*, is fully consistent with prior Commission practice regarding grandfathering.[168]  This approach strikes the appropriate balance

---

[163] *See supra* para.7.

[164] *See supra* para. 8 & note 25.  In fact, the Commission provided additional notice in 1998 with the release of the Notice of Inquiry in that proceeding.

[165] *See supra* para. 10 & note 33.

[166] *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006).

[167] ION Comments at 21-23; ION July 15, 2016, *Ex Parte* Letter at 3; Trinity July 29, 2016, *Ex Parte* Letter at 4.

[168] *See, e.g.*, *Local TV Ownership Order*, 14 FCC Rcd at 12909, para. 11 ("Any transfer of a grandfathered combination after the adoption date of this Report and Order (whether during the initial grandfathering period [or] after a permanent grandfathering decision has been made) must meet the [existing] radio/TV cross-ownership rule."); *Applications of Stauffer Communications, Inc.*, Memorandum Opinion and Order, 10 FCC Rcd 5165, 5165, para. 3 (1995) ("[G]randfathered status under our multiple ownership rules terminates upon Commission approval of a transfer of control."); *Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, Second Report and Order, 50 FCC 2d 1046, 1076, para. 103 (1975) (grandfathering existing combinations of newspapers and broadcast stations, but requiring future owners to comply with the new rule prohibiting cross-ownership of newspapers and broadcast stations); *2002 Biennial Review Order*, 18 FCC Rcd at 13809-10, para. 487 (grandfathering existing radio and television station combinations that would have been out of compliance under the new rules, but making clear that such grandfathering was not transferable); *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, Report and Order, 29 FCC Rcd 6567, 6848-49, paras. 691-693 (2014) (grandfathering existing station combinations that otherwise would no longer comply with the media ownership rules as a result of the auction, but, upon transfer, requiring new owners to comply with the rules in place at the time of the transfer or obtain a waiver).  *See also Notice*, 28 FCC Rcd at 14331-32, para. 20.

Federal Communications Commission                    FCC 16-116

between avoiding imposition of the hardship of divestiture on owners of existing station combinations who have long owned the combination in reliance on the rules, and moving the industry toward compliance with current rules when owners voluntarily decide to sell their stations.[169]  The grandfathering rule we adopt today preserves existing combinations, like ION's, that resulted in new broadcast networks. We note that despite ION's broad assertion, networks continue to exist with owned and operated station groups that comply with the national audience reach cap, or which are far below the nearly 65 percent nationwide coverage reached by ION's station group.  In addition, we note that even if the Commission permitted a grandfathered station group to be transferred intact, there would be no obligation for the new buyer to maintain the stations' current network affiliation or the programming aired by the current licensee.  Thus, we conclude that the public interest would not be served by allowing grandfathered combinations to be freely transferable in perpetuity where a combination does not comply with the national audience reach cap at the time of transfer or assignment simply because the combination once resulted in a new network.

      53.    Finally, we find that the record does not support Univision's request that we fashion a specific waiver standard for violations of the national audience reach cap that result from elimination of the UHF discount.  We note that parties may always petition the Commission for a waiver under our existing rules if they believe unique circumstances warrant a waiver in a particular case.[170]  However, we expect such circumstances to be rare and isolated given that only a few existing broadcast television station ownership groups will exceed the cap with the elimination of the discount.  Ultimately, there are many different ways to structure an assignment or transfer of control that may present varying levels of concern regarding the potential impact of a proposed transaction.  Given the fact-specific nature of our review of such transactions, a specific waiver standard is not appropriate.  Instead, we believe that a case-by-case approach will best serve the public interest by allowing the Commission to consider the unique circumstances of any proposed transaction involving grandfathered combinations and its potential impact on competition.[171]

### D.    VHF Discount

      54.    In the *Notice*, the Commission sought comment on whether it would be appropriate at this time to adopt a "VHF discount."[172]  Several commenters contend that it would be inappropriate for the Commission to adopt a VHF discount at this time.[173]  Public Interest Commenters assert that the justifications used to support the UHF discount at the time of its implementation are not applicable to digital VHF stations in the present situation.[174]  For instance, they note that a limited percentage of television households rely exclusively on over-the-air service, which greatly reduces the impact of any VHF signal coverage limitations.[175]  Instead of adopting a VHF discount, these commenters urge the

---

[169] Furthermore, as noted above, station owners were effectively on notice that entities that acquired television stations after implementation of the 1996 Act and that complied with the national audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's action on the UHF discount.  *See supra* para. 7 & note 161; *see also supra* note 24 (noting that as early as 1992 the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount).

[170] *See* 47 CFR § 1.3.  *See also WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969).

[171] Univision, Trinity, and ION assert generally that such a case-by-case approach is "often untimely and difficult to manage in a financial/commercial setting," but offer no specific facts or examples.  Univision, Trinity, and ION August 15, 2016, *Ex Parte* letter at 2.

[172] *Notice*, 28 FCC Rcd at 14332-33, paras. 22-23.

[173] *See, e.g.*, Free Press Comments at 7-8; Public Interest Commenters Reply at 10; CCA Comments at 3.

[174] Free Press Comments at 7; Public Interest Commenters Reply at 10.

[175] Free Press Comments at 3, 7-8; Public Interest Commenters Reply at 10.  *See also* ION Comments at 10.  The Public Interest Commenters state that when the Commission adopted the UHF discount, half of U.S. households

(continued….)

Commission to address VHF propagation issues on a case-by-case basis, arguing that occasional deficiencies in some digital VHF stations do not justify a universal VHF discount applicable to the whole band.[176] As Free Press points out, the Commission has already taken steps to resolve signal propagation issues in the VHF band by permitting stations to operate at a higher power than originally authorized.[177] Additionally, other commenters note that VHF stations still possess greater commercial and economic advantages acquired during the analog era.[178] Thus, they argue that these stations are not inferior to other competing stations in the way that nascent UHF stations were at the time the UHF discount was adopted.[179]

55.    Other commenters contend, however, that, if the Commission eliminates the UHF discount, it would be arbitrary and capricious not to adopt a VHF discount.[180] These commenters argue that VHF stations today suffer from the same diminished audience reach that once afflicted the UHF band.[181] They assert that VHF stations are less desirable for digital broadcasting because VHF signals face increased interference and require larger antennas for reception.[182] Therefore, they urge the Commission to adopt, at a minimum, a 50 percent VHF discount.[183]

56.    We decline to adopt a VHF discount at this time. On balance, we disagree with commenters that eliminating the UHF discount also requires concurrent adoption of a VHF discount. As noted above, the DTV transition has made UHF spectrum generally more desirable than VHF spectrum for purposes of digital television broadcasting.[184] Yet, despite the challenges to the digital VHF band, the current record does not convince us that digital television operations in the VHF band are universally technically inferior to operations in the UHF band in a manner or to a degree that would warrant a

(Continued from previous page) ————————————————————

watched television over the air, but now only 10 percent of television households are exclusively over-the-air. Public Interest Commenters Reply at 10; *see also* Free Press Comments at 3, 7-8.

[176] Free Press Comments at 8-9; Public Interest Commenters Reply at 10.

[177] Free Press Comments at 8 (citing Video Division March 16, 2011, Letter). *See supra* para. 14 & note 52. The Commission is exploring engineering options to increase the utility of VHF spectrum and is considering new VHF maximum power limits to help improve signal strength and compensate for higher noise levels, especially for consumers that use indoor antennas. *See Broadcast Innovation NPRM*, 25 FCC Rcd at 16513-17, paras. 46-57. The Commission has also granted special temporary authority to a number of digital VHF stations for such power increases beyond the maximum limits to improve DTV reception. *Id.* at 16513, para. 48 (citing as examples WHAS-TV, Louisville, KY, Ch. 11, BDSTA-20091014AAM; WABC-TV, New York, NY, Ch. 7, BDSTA-20100108ACK; WUSA, Washington, DC, Ch. 9, BDSTA-20091218ACS; KRCR-TV, Redding, CA, Ch. 7, BDSTA-20090717ABBADD).

[178] For example, ION states that analog VHF stations used their market positions to build audiences and relationships with advertisers and networks, and today, these stations continue to benefit from established reputations. ION Comments at 10; ION July 15, 2016, *Ex Parte* Letter at 2. *See also* Public Interest Commenters Reply at 10.

[179] Public Interest Commenters Reply at 10. Although not opposed to a VHF discount, ION and Sinclair also recognize the many historical economic advantages that VHF stations continue to enjoy. *See* ION Comments at 9-10 and n.18; ION July 15, 2016, *Ex Parte* Letter at 2; Sinclair Comments at 7-8.

[180] Fox Comments at 2-3, 22; Sinclair Comments at 15. *See also* Block Comments at 3 (supporting adoption of a VHF discount to promote efficient use of both UHF and VHF television bands).

[181] Fox Comments at 22-23; Sinclair Comments at 15.

[182] Fox Comments at 22; Sinclair Comments at 15.

[183] *See* Fox Comments at 22. *But cf.* Free Press Comments at 8 (stating that if adopted, a VHF discount should be calculated based on available data, because it is misguided to assume that every VHF station covers merely 50 percent of the households in a DMA).

[184] *See supra* para. 14.

discount.[185]  The record does not provide clear evidence that digital VHF stations consistently suffer from significant technical disadvantages in audience coverage sufficient to justify adoption of a discount.[186]  Further, the record lacks evidence that the economic viability of VHF stations would be threatened without a discount.[187]  Moreover, as discussed above, the Commission has already taken steps to assist individual VHF stations in addressing technical concerns.[188]  Accordingly, we decline to adopt a VHF discount.

## IV.    PROCEDURAL MATTERS

### A.    Final Regulatory Flexibility Analysis

57.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[189] the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order in MB Docket No. 13-236.  The FRFA is set forth in Appendix B.

### B.    Paperwork Reduction Act Analysis

58.    This document does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13, *see* 44 U.S.C. §§ 3501-3520.  In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

### C.    Congressional Review Act

59.    The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

## V.    ORDERING CLAUSES

60.    Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310, this Report and Order **IS ADOPTED**.  The rule modification attached hereto as Appendix A shall be effective thirty (30) days after publication of the text or summary thereof in the *Federal Register*.

61.    **IT IS FURTHER ORDERED** that the Commission **SHALL SEND** a copy of this Report and Order to Congress and to the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

---

[185] As discussed above, several commenters argue that the justifications used to support the UHF discount are not applicable to digital VHF stations.  *See supra* para. 54.

[186] To the extent VHF stations have experienced signal propagation issues as a result of the digital transition, those effects are limited not only by steps the Commission has already taken, as discussed above, but also by increased MVPD penetration, which was not the case for UHF stations when the Commission adopted the UHF discount.

[187] *See* Public Interest Commenters Reply at 10 (stating that no commenters have argued that VHF station owners now face economic hardship).

[188] *See supra* para. 14 & note 52.

[189] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. § 601 *et seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

---
**Federal Communications Commission**                    **FCC 16-116**

---

62.      **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION



Marlene H. Dortch
Secretary

**APPENDIX A**

**Final Rule**

**PART 73 – RADIO BROADCAST SERVICES**

1.  The authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 303, 334, 336 and 339.

2.  Amend § 73.3555 by revising paragraph (e) to read as follows:

**§ 73.3555 Multiple ownership.**

* * * * *

(e) National television multiple ownership rule.

 (1) No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

(2) For purposes of this paragraph (e):

(i) National audience reach means the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. For purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA market.

* * * * *

APPENDIX B

**Final Regulatory Flexibility Act Analysis for the *Report and Order***

1.      As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Notice of Proposed Rulemaking* (*Notice*) in this proceeding.[2] The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Notice*, including comment on the IRFA. The Commission received no comments on the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.      Need for, and Objectives of, the Report and Order**

2.      This *Report and Order* eliminates the so-called "UHF discount" in the Commission's national television multiple ownership rule. The national television ownership rule currently prohibits a single entity from owning television stations that, in the aggregate, reach more than 39 percent of the total television households in the nation.[4] Prior to this *Report and Order*, the rule provided television stations broadcasting in the UHF spectrum to count only 50 percent of the television households in their Designated Market Areas (DMAs); this is termed the UHF discount.[5] The UHF discount was adopted in recognition of the technical inferiority of UHF signals in analog television broadcasting and was intended to mitigate the competitive disadvantages that UHF stations experienced in comparison to VHF stations because of their weaker signals and smaller audience reach.[6]

3.      Yet the Commission concludes in the *Report and Order* that the technical justification for the UHF discount no longer exists. The evidence establishes that the digital UHF band does not suffer from the same technical limitations as the analog UHF band. Therefore, the Commission eliminates the UHF discount from the national television multiple ownership rule with this *Report and Order*. The Commission also adopts the grandfathering proposals presented in the *Notice*.[7] The Commission finds that these proposals do not harm existing broadcast station ownership groups exceeding the national audience reach cap due to the elimination of the UHF discount and are consistent with the protections it has provided in previous decisions.

4.      Legal Basis.  The authority for the action taken in this rulemaking is contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310.

**B.      Summary of Significant Issues Raised in Response to the IRFA**

5.      No public comments were filed in response to the IRFA.

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996 (CWAAA).

[2] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14337-40, App. B (2013) (*Notice*).

[3] 5 U.S.C. § 604.

[4] 47 CFR § 73.3555(e)(1).

[5] *Id.* § 73.3555(e)(2)(i).

[6] *See Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* Memorandum Opinion and Order, 100 FCC 2d 74, 92-94, paras. 42-44 (1985).

[7] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

Federal Communications Commission                    FCC 16-116

C.    **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

6.      Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[8]  The Chief Counsel did not file any comments in response to the proposed rules.

D.    **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

7.      The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted in the *Report and Order*.[9]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[11]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12]

8.      *Television Broadcasting*.  The SBA designates television broadcasting stations with $38.5 million or less in annual receipts as small businesses.[13]  Television broadcasting includes establishments primarily engaged in broadcasting images together with sound.  These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.[14]  The Commission estimates that there are 1,387 licensed commercial television stations in the United States.[15]  In addition, according to Commission staff review of the BIA/Kelsey Media Access Pro Television Database as of March 25, 2016, 1,264 (or about 91 percent) of the estimated 1,387 commercial television stations have revenues of $38.5 million or less and, thus, qualify as small entities under the SBA definition.  We therefore estimate that the majority of commercial television broadcasters are small entities.  The Commission has also estimated the number of licensed noncommercial educational ("NCE")

---

[8] 5 U.S.C. § 604(a)(3).

[9] 5 U.S.C. § 603(b)(3).

[10] *Id.* § 601(6).

[11] *Id.* § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632).  Pursuant to the RFA, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  5 U.S.C. § 601(3).

[12] 15 U.S.C. § 632.

[13] The SBA raised its standards for television broadcasting stations in 2012.  Previously, television broadcasting stations with no more than $14 million in annual receipts were considered a small business pursuant to the SBA's standards.  Those standards have since increased to $38.5 million in annual receipts.  *See* U.S. Small Business Administration, Small Business Size Standards:  Information, 77 Fed. Reg. 72702, 72705 (Dec. 6, 2012).  *See also* 13 CFR § 121.201, NAICS code 515120.

[14] U.S. Census Bureau, *2012 NAICS Definition, 515120 Television Broadcasting*, http://www.census.gov./eos/www/naics/index.html (visited June 23, 2016).

[15] *See* Press Release, FCC, Broadcast Station Totals as of December 31, 2015, (Jan. 8, 2016), https://apps.fcc.gov/edocs_public/attachmatch/DOC-337189A1.pdf (visited June 23, 2016).

television stations to be 390.[16]  These stations are non-profit, and therefore considered to be small entities.[17]

9.      We note, however, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[18] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive to that extent.

**E.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.     The *Report and Order* modifies the calculations underlying the national television multiple ownership rule as set forth in paragraph 3 above, which would affect reporting, recordkeeping, or other compliance requirements.  The conclusion modifies several FCC forms and their instructions:  (1) FCC Form 301, Application for Construction Permit for Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License.  The Commission may have to modify other forms that include in their instructions the media ownership rules or citations to media ownership proceedings, including Form 303-S and Form 323.  The impact of these changes will be the same on all entities, and we do not anticipate that compliance will require the expenditure of any additional resources as the proposed modification to the calculations underlying the national television multiple ownership rule will not place any additional obligations on small businesses.

**F.      Steps Taken to Minimize Significant Impact on Small Entities and Significant Alternatives Considered**

11.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[19]  The *Notice* invited comment on issues that had the potential to have significant impact on some small entities.[20]

12.     The rule change adopted in this *Report and Order*, as set forth in paragraph 3 above, is intended to achieve our public interest goal of competition.  By recognizing the technical advancements of the UHF band after the DTV transition, this *Report and Order* seeks to create a regulatory landscape that reflects the current value of UHF spectrum in order to better assess national television ownership figures.  Further, this *Report and Order* complies with the President's directive for independent agencies

---

[16] *See id.*

[17] 5 U.S.C. §§ 601(4), (6).

[18] "[Business concerns] are affiliates of each other when one [concern] controls or has the power to control the other, or a third party or parties controls or has to power to control both."  13 CFR § 121.103(a)(1).

[19] 5 U.S.C. § 603(c).

[20] *See Notice*, 28 FCC Rcd at 14337, App. B, para. 1.

to review their existing regulations "to determine whether such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives."[21]  By eliminating an outdated rule, we seek to reduce the costs and burdens of compliance on firms generally, including small business entities.  And we find that the benefits of our decision to eliminate the UHF discount outweigh any costs or other burdens that may result from our action.  In addition, the grandfathering proposal the Commission adopts in the *Report and Order* aims to create a more effective regulatory landscape by addressing current market realities.  Overall, this *Report and Order* seeks to expand broadcast ownership opportunities for station owners, which includes small entities, by accurately reflecting broadcast television ownership in the digital age.  Given that the technical justification for the UHF discount no longer exists, continued application of the discount stifles competition by encouraging consolidation instead of promoting new entrants in local broadcast television markets.  Therefore, the Commission believes the rule change adopted in this *Report and Order* will benefit small entities, not burden them.

> **G.    Reports to Congress and Government Accountability Office**

13.    The Commission will send a copy of the *Report and Order*, including this FRFA, to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[22]  The *Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[23]

---

[21] Exec. Order No. 13579, 76 Fed. Reg. 41587 (July 14, 2011).

[22] *See* 5 U.S.C. § 801(a)(1)(A).

[23] *See id.* § 604(b).

Federal Communications Commission                    FCC 16-116

APPENDIX C

List of Commenters

**Comments filed in MB Docket No. 13-236**
1.      Block Communications, Inc. (Block)
2.      Competitive Carriers Association (CCA)
3.      21st Century Fox, Inc. and Fox Television Holdings, Inc. (Fox)
4.      Free Press (Free Press)
5.      ION Media Networks, Inc. (ION)
6.      National Association of Broadcasters (NAB)
7.      Sinclair Broadcast Group, Inc. (Sinclair)
8.      Trinity Christian Center of Santa Ana, Inc. (Trinity)
9.      Univision Communications, Inc. (Univision)
10.     Writers Guild of America, West, Inc. (WGAW)

**Reply Comments filed in MB Docket No. 13-236**
1.      Free Press, Common Cause, Media Alliance, and the Office of Communication, Inc. of the
        United Church of Christ (Public Interest Commenters)
2.      National Association of Broadcasters (NAB)
3.      Tribune Company (Tribune)

Federal Communications Commission                    FCC 16-116

## DISSENTING STATEMENT OF
## COMMISSIONER AJIT PAI

Re:     *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236.

In this *Order*, the Commission votes to substantially tighten the national audience reach cap ("national cap"), which restricts the percentage of households in the United States that a single company can serve through commercial television broadcast stations. Currently, the rule states that no entity can own commercial television stations in markets containing more than 39% of U.S. television households.[1] But there's a catch. For purposes of calculating compliance with the national cap, a UHF television station is "attributed with 50 percent of the television households" in its market.[2]

This is called the UHF discount, and today the Commission decides to eliminate it. That will substantially change the impact of the national cap. Consider the example of Univision. Right now, Univision's national audience reach for purposes of the national cap is only 22.8%, which is well below 39%. This means that under our current regulations, Univision has room to purchase television stations in many new markets. With the termination of the UHF discount, however, Univision's national audience reach will rise to 44.8%, a figure above the national 39% cap. Accordingly, Univision will not have the ability to purchase television stations in *any* new market.

To be sure, the technical basis for the UHF discount no longer exists. In the analog era, UHF stations were technically inferior to VHF stations. But with the digital transition, that is no longer true. Indeed, UHF stations are now technically superior to VHF stations. Therefore, I would have supported eliminating the UHF discount in the context of a general review and adjustment of our 39% national cap. But the Commission should not eliminate the UHF discount without also considering an adjustment to the national cap to reflect today's marketplace. Indeed, I believe that the Commission is acting unlawfully by taking that step.

Why is this *Order* arbitrary and capricious? Recall the Commission's failed attempt to restrict joint sales agreements (JSA) between television stations. Back in 2014, the Commission tried to attribute these JSAs. This meant that a station selling more than 15% of another television station's advertising time would be counted as owning that station for purposes of the Commission's ownership rules.[3]

As the Third Circuit observed when reviewing the Commission's decision, "attribution of television JSAs modifie[d] the Commission's ownership rules by making them more stringent."[4] In particular, the decision to attribute JSAs had the effect of tightening the local television ownership rule, which limits the number of television stations that a single company can own in a given television market. At the time that the Commission decided to attribute television JSAs, however, it expressly declined to decide whether the local television ownership rule was still in the public interest. And it certainly did not set forth any case for why the local television ownership rule should be made more stringent.

Therefore, the Third Circuit vacated the television JSA attribution rule. The court reasoned that "unless the Commission determines that the preexisting ownership rules are sound, it cannot logically

---

[1] *See* 47 C.F.R. § 73.3555(e)(1).

[2] *Id.* § 73.3555(e)(2)(i).

[3] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket No. 14-50, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4527–42, paras. 340–67 (2014).

[4] *Prometheus Radio Project v. FCC*, 824 F.3d 33, 58 (3d Cir. 2016).

demonstrate that expansion is in the public interest."[5]  The same is true here.  It is undeniable that eliminating the UHF discount has the effect of expanding the scope of the national cap rule.  Companies, such as Univision, that are currently in compliance with the national cap ownership rule will be above the cap once the UHF discount is terminated.  Yet, the Commission has refused to review whether the current national cap ownership rule is sound or whether there is a need to make it more stringent, which is precisely what this *Order* does.

    The Commission attempts to distinguish this *Order* from the JSA precedent by noting that the local television ownership rule is subject to the quadrennial review obligation set forth in section 202(h) of the Telecommunications Act of 1996, while the national cap rule is not.[6]  But this, in my view, is not a decisive distinction.  The Commission may not have a legal obligation to review the national cap every four years, but once it chooses to review it, it cannot take piecemeal action that would substantially tighten it without examining whether tightening the rule as a whole is justified.[7]

    Here, for example, it has been over seven years since the completion of the digital television transition.  And during those seven years when the UHF discount has been on the books, is there any evidence that the national cap has been insufficiently stringent?  Is there any indication that any of the core objectives of the Commission's media ownership policies—competition, diversity, and localism—have been harmed?  Tellingly, the Commission is unable to point to any such evidence.

    Moreover, even absent the specific legal requirement to review particular media ownership regulations every four years pursuant to section 202(h) of the Telecommunications Act of 1996, "courts have held that the Commission has an affirmative obligation to reexamine its rules over time."[8]  And the agency's obligation surely applies to the national cap rule given both the rule's unique history and the Commission's elimination of the UHF discount, thus substantially tightening the cap.

    In 1998, the Commission chose to retain the 35% national cap that it had adopted two years earlier.[9]  But the D.C. Circuit found the FCC's decision arbitrary and capricious.  Specifically, it stated that "the Commission ha[d] adduced not a single valid reason to believe the [35% national cap rule] [was] necessary in the public interest, either to safeguard competition or to enhance diversity."[10]  On remand, the Commission in 2003 found that a 35% national cap could not be justified and raised the cap to 45%.[11]

---

[5] *Id.*

[6] *See Order* at note 139.

[7] The Commission also claims that this *Order* differs from the television JSA attribution rule because it grandfathers station groups that will exceed the national cap after the elimination of the UHF discount while the Commission allowed for no such grandfathering in the JSA context.  *See id.*  But this distinction is also irrelevant.  What matters is that the Commission is making the national cap rule more stringent.  Companies that currently have the ability to purchase television stations in new markets won't be able to do so once this *Order* takes effect.  And as the Third Circuit indicated, the Commission cannot "logically demonstrate that an expansion [of the rule] is in the public interest" "unless[it] demonstrates that the preexisting ownership rule[] is sound."  *Prometheus*, 824 F.3d at 58.

[8] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14329–30, para. 14 (2013) (*Notice*).

[9] *See 1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Report, 15 FCC Rcd 11058, 11072–75, paras. 25–30 (2000).

[10] *Fox Television Stations Inc. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002).

[11] *See 2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13814–45, paras. 499–584 (2003).

The next year, Congress instructed the Commission to adjust the cap down to 39%,[12] and it has remained there ever since.

So we are now facing a 39% national cap that has not been adjusted or reviewed for a dozen years.  During that time, the video industry has undergone revolutionary change.  In particular, the rise of over-the-top video has transformed the video marketplace.  For instance, Netflix, YouTube, Amazon, and Hulu all did not offer Internet video when the national cap was set at 39%.  We are confronting a 39% national cap that the Commission itself has never justified.  Indeed, the last time that the Commission reviewed the merits of the national cap it concluded that a 45% cap was justified.  And we are dealing with a 39% cap that approximates the cap that the D.C. Circuit rejected over a decade ago.

Of course, one might object that all of this is irrelevant because Congress told the Commission to set the national cap at 39% in 2004, and that's reason enough to leave it unchanged in 2016.  That argument might have some force had the Commission been content to leave the national cap rule alone.  But having fiddled with one critical component of the rule—the UHF discount—the FCC can't obstinately refuse to review another, especially when the Commission affirms that doing so is within its power.[13]

Given this history and the vast changes in the media marketplace since the 39% cap was set, the Commission's assertion that "[n]o party has presented persuasive reasons for revisiting the national cap at this time"[14] rings hollow.  And indeed, that claim is undermined to the extent that eliminating the UHF discount effectively tightens the national cap dramatically.

Turning to the other reasons provided by the Commission for refusing to reexamine the national cap, the *Order* notes that such reexamination "is not within the scope of the *Notice*,"[15] and that "[i]nitiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap . . . would only delay the correction of audience reach calculations necessitated by the digital transition."[16]  This is the administrative equivalent of the teenager who murders his parents and then pleads for judicial mercy as an orphan.

When the Commission took up the *Notice* in this proceeding, I asked my colleagues to simultaneously seek comment on eliminating the UHF discount and adjusting the national cap.[17]  Back then, I specifically argued that we could not "modify the UHF discount without simultaneously reviewing the national audience cap."[18]  Unfortunately, my plea fell on deaf ears.

Now, almost three years later, we are told that reviewing the national cap would delay elimination of the UHF discount.  But had we sought comment on adjusting the national cap in the *Notice* as I requested, we would have had more than enough time to complete that review over the course of the last 35 months.

Moreover, it is worth noting that when it comes to eliminating the UHF discount, the FCC has not exactly embraced what President Obama has referred to as the fierce urgency of now.  If time is of the

---

[12] *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99–100 (2004).

[13] *See Order* at para. 21.

[14] *Order* at para. 40.

[15] *Id.*

[16] *Id.*

[17] *Notice*, 28 FCC Rcd at 14343–44 (Dissenting Statement of Commissioner Ajit Pai).

[18] *Id.* at 14343.

essence and delay can't be tolerated, then why did it take almost three years to complete this rulemaking? The Commission offers no explanation.

Finally, I disagree with the *Order*'s approach to grandfathering. While I appreciate the fact that companies no longer in compliance with the national cap due to elimination of the UHF discount will not be required to sell stations immediately, the Commission should also allow such station groups to be transferred to new ownership without requiring divestitures. Station groups such as ION and Univision have been good for competition in the video market by facilitating the creation of new broadcast networks to challenge established networks. And I do not see what harm would be alleviated or purpose would be served by requiring these station groups to be broken up in the event of a sale.

I also believe that the grandfathering of station groups should be pegged to the date this *Order* becomes effective rather than the date that the *Notice* was adopted—almost three years ago. As I said when the Commission proposed its approach in the *Notice*:

> [*The Notice*] only proposes to eliminate the UHF discount. It does not actually end the UHF discount. The UHF discount will be the law of the land tomorrow and every day after that unless the Commission votes to repeal it. Through its grandfathering proposal, however, today's NPRM effectively tells the private marketplace to behave as if the UHF discount has already been eliminated, treating the rest of the rulemaking process like an empty formality.[19]

And sure enough, I was right. Following the adoption of the *Notice*, the private sector behaved as if the UHF discount had already been eliminated. No company sought to purchase any television station that would have put it above the 39% cap as calculated without the UHF discount. The UHF discount, as a practical manner, was eliminated without the Commission actually repealing it. The rest of the rulemaking process, which ended up taking almost three years, was in fact an empty formality. This "sentence first, verdict afterwards" process makes a mockery of the notice-and-comment rulemaking process and sets a disturbing precedent for future proceedings.

For all of these reasons, I dissent.

---

[19] *Id*. at 14344.

### DISSENTING STATEMENT OF
### COMMISSIONER MICHAEL O'RIELLY

Re:    *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, MB Docket No. 13-236*

In a perfect world, the Commission ought to be able to thoughtfully update its media ownership rules to reflect current marketplace realities. Such a universe doesn't exist at this Commission on these issues, as politics has become more important than substance. With this item, the majority continues that practice.

It is clear that UHF television stations are no longer less desirable or less technology-capable than VHF stations. The conversion of television stations from analog to digital, the excessive prevalence of multichannel video programming distributors, changing personal media consumption habits, and other factors have essentially eliminated the original differences between the two frequencies. The stations are rather interchangeable and shouldn't be treated differently for purposes for our market audience reach calculations. While making this rule change may have little practical impact, I would support it as a policy matter, as I would be open to considering an increase in the national ownership limit, if the Commission had the authority to do so.

However, I reject the assertion that the Commission has authority to modify the National Television Ownership Rule in any way, including eliminating the UHF discount, and therefore I dissent. The pertinent language ultimately included in the 2004 Consolidated Appropriations Act ("CAA") was heavily negotiated and painstakingly crafted in order to settle a recurring and particularly contentious media ownership issue. I know since I was there at the time and helped reach the agreement on behalf of a former employer with the staff of many Members of Congress, including former Senator Ted Stevens, who was lead negotiator, a detail that helps explain why the provision ended up in an appropriations bill. The result was a national ownership cap that remains one of the few media ownership rules specifically set by statute and the only one exempted from the Quadrennial Review process governing the other ownership rules, in order to protect a tenuous compromise from the whims of the Commission. Since enactment, many parties have advocated changes in different elements of this compromise for a wide variety of reasons, including those cited here. But the only acceptable venue for these arguments is Congress. The need, yet again, for the Commission to resort to generic provisions like 4(i) or 303(r) for authority belies its disingenuous interpretation of the CAA.

Even if the Commission had authority to change the National Television Ownership Rule, this Order would be the wrong way to go about it. Having apparently learned nothing from past efforts to prematurely change attribution rules for JSAs before the Quadriennial Review of media ownership rules was complete, the Commission is replicating the same flawed approach. This item stubbornly plows ahead in a similar cart-before-the-horse scheme to tinker with a calculation methodology without any consideration of the current validity the overall rule it modifies. Just consider the simple fact that the Commission seems to have no hesitation altering the market realities of UHF stations despite that these are some of same stations participating in the broadcast incentive auction. As one of the commenters observed, the Commission's move "reflects an agency staring so hard at a single tree that it has lost sight entirely of the forest."[1]

---

[1] Fox Comments 1.

Meanwhile, the "forest" of the current media marketplace is thriving, proliferating and changing at a breathtaking rate.  But the Commission seems to be affected by some sort of tunnel vision that blinds it to the many radical changes in the way media is produced and consumed.  Thus, impervious to any intrusion of reality, the media ownership rules now operate as a one-way ratchet that can only be tightened, never relaxed, despite the overwhelming evidence that broadcasters are operating in a much more competitive environment than ever before.

This document is scheduled to be published in the
Federal Register on 10/24/2016 and available online at
**https://federalregister.gov/d/2016-25569**, and on **FDsys.gov**

6712-01

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Part 73**

**[MB Docket No. 13-236; FCC 16-116]**

**National Television Multiple Ownership Rule**

**AGENCY:**  Federal Communications Commission.

**ACTION:**  Final rule.

**SUMMARY:**  This document eliminates the UHF discount from the calculation of the national television audience reach cap because it is no longer justified due to the transition to digital television.  The discount attributes television stations broadcasting in the UHF spectrum with only 50 percent of the television households in their Designated Market Areas (DMAs).  To avoid imposing undue harm on existing broadcast television station groups that exceed the national audience reach cap without the benefit of the UHF discount, this Report and Order grandfathers combinations:  in existence on September 26, 2013 (Grandfather Date), the release date of the Notice of Proposed Rulemaking (NPRM) in this proceeding; created by a transaction that had received Commission approval on or before the Grandfather Date; and proposed in applications pending before the Commission on the Grandfather Date.

**DATES:**  Effective [**INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

**FOR FURTHER INFORMATION CONTACT:**  Brendan Holland, Industry Analysis Division, Media Bureau, Brendan.Holland@fcc.gov (202) 418-2757.

**SUPPLEMENTARY INFORMATION:**  This Report and Order in MB Docket No. 13-236 was adopted August 24, 2016, and released September 7, 2016.  The full text of this document is

available for public inspection during regular business hours in the FCC Reference Center, 445 12th Street, SW., Room CY-A257, Washington, DC 20554, or online at https://www.fcc.gov/ecfs/filing/0907563506002/document/090756350600263ba.  To request this document in accessible formats for people with disabilities (e.g. braille, large print, electronic files, audio format, etc.) or to request reasonable accommodations (e.g. accessible format documents, sign language interpreters, CART, etc.), send an email to fcc504@fcc.gov or call the FCC's Consumer and Governmental Affairs Bureau at (202) 418-0530 (voice), (202) 418-0432 (TTY).

**Synopsis of the Report and Order**

1.    Background.  Three decades ago in 1985, to protect localism, diversity, and competition, the Commission amended its national television multiple ownership rule to include a national audience reach cap that prohibited a single entity from owning television stations that collectively reached more than 25 percent of the total television households in the nation.  At that time, the Commission recognized the inherent physical limitations of the UHF television band, finding that the strength of UHF television signals decreased more rapidly with distance in comparison to the signals of stations broadcasting in the VHF band, resulting in significantly smaller coverage areas and audience reach.  This finding was significant because, at the time, the vast majority of viewers received programming from broadcast television stations via over-the-air signals.  Thus, a smaller over-the-air signal made it harder for UHF stations to compete with incumbent VHF stations, which maintained greater coverage areas.  To account for this coverage disparity, the Commission determined that licensees of UHF stations should be attributed with only 50 percent of the television households in their DMAs for purposes of calculating the national audience reach cap.  This rule is termed the UHF discount.

2.      As early as 1992, the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount, and sought comment on whether any distinction between UHF and VHF stations would be appropriate in light of the transition.  A few years later, in the Telecommunications Act of 1996 (1996 Act), Congress directed the Commission to modify its ownership rules to increase the national audience reach cap from 25 percent to 35 percent of the total nationwide audience.  In the 1996 Act Implementation Order (11 FCC Rcd 12374), the Commission noted that it was reviewing the UHF discount in the context of its television broadcast ownership rules, and explicitly cautioned that any entity that acquired stations during this interim period and complied with the 35 percent audience reach cap only by virtue of the UHF discount would be subject to the outcome of the pending rule making proceeding.  In the 1998 Biennial Review Order (15 FCC Rcd 11058), the Commission retained the UHF discount, but stated that it would likely be unnecessary after the digital television transition and that the Commission would initiate a proceeding in the future to phase out the discount.  In the 2002 Biennial Review Order (18 FCC Rcd 13620), the Commission raised the national audience reach cap to 45 percent and again concluded that, "the digital [television] transition [would] largely eliminate the technical basis for the UHF discount because UHF and VHF signals [would] be substantially equalized."  Therefore, the 2002 Biennial Review Order adopted rules to phase out the UHF discount for broadcast stations owned by the Big Four networks (ABC, CBS, NBC, and Fox) on a market-by-market basis at the time the markets transitioned to DTV.  The Commission indicated further that, for networks and station groups other than those stations owned and operated by the Big Four networks, it would decide in a subsequent biennial ownership review whether to extend the sunset to all other networks and

station group owners.  The rules at that time contemplated a gradual, market-by-market transition to DTV, but this approach was later replaced by a hard deadline – June 12, 2009.

3.      Following adoption of the <u>2002 Biennial Review Order</u>, Congress subsequently rolled back the 45 percent national audience reach cap by including a provision in the 2004 Consolidated Appropriations Act (CAA) directing the Commission to set the cap at 39 percent of national television households.  The CAA further amended section 202(h) of the 1996 Act to require a quadrennial review of the Commission's broadcast ownership rules rather than the previously mandated biennial review.  In doing so, Congress removed the requirement to review any rules relating to the 39 percent national audience reach cap from the quadrennial review requirement.  The CAA did not mention the UHF discount, nor did it address the potential impact of the DTV transition on the calculation of the national audience reach cap.

4.      Prior to the enactment of the CAA, several parties had appealed the Commission's <u>2002 Biennial Review Order</u> to the U.S. Court of Appeals for the Third Circuit (Third Circuit).  In June 2004, the Third Circuit found, among other things, that the CAA rendered moot the challenges to the Commission's decision to retain the UHF discount (373 F.3d 372).  The court further found that the CAA insulated the national audience reach cap, including the UHF discount, from the Commission's quadrennial review of its media ownership rules.  At the same time, however, the court stated that its decision did not foreclose the Commission's consideration of the UHF discount in a rulemaking separate from the required quadrennial review of its ownership rules.  The court concluded that, barring congressional intervention, the Commission could decide the scope of its authority to modify or eliminate the UHF discount outside the context of section 202(h).  Prior to the court's decision, in February 2004, the Media Bureau issued a <u>Public Notice</u> specifically seeking comment on the Commission's authority to

4

modify or eliminate the UHF discount in light of the CAA.  In particular, the Media Bureau sought comment on whether the passage of the 39 percent cap signified congressional approval, adoption, or ratification of the 50 percent UHF discount.  The comments and replies were filed in the docket for the 2002 Biennial Review Order.

5.     In July 2006, the Commission issued a Further Notice of Proposed Rulemaking (FNPRM) as part of its 2006 quadrennial review of the media ownership rules (21 FCC Rcd 8834).  Among other things, the FNPRM sought comment on the UHF discount rule in light of the Third Circuit's holding and queried whether the Commission should retain, modify, or eliminate the UHF discount.  Comments filed in response to the FNPRM also refreshed the Commission's record on its authority to alter the UHF discount.  In February 2008, the Commission concluded in the 2006 Quadrennial Review Order (23 FCC Rcd 2010) that the UHF discount was insulated from review under section 202(h) as a result of the CAA, and thus beyond the parameters of the quadrennial review.  But the Commission noted that the Third Circuit's 2004 decision had left it to the Commission to decide the scope of its authority to modify or eliminate the UHF discount outside the context of section 202(h).  Accordingly, the Commission indicated that it would address the petitions, comments, and replies filed with respect to the alteration, retention, or elimination of the UHF discount in a separate proceeding, which would be commenced at a future date.

6.     Since June 13, 2009, all full-power television stations have broadcast their over-the-air signals exclusively in digital form.  The DTV transition has enabled broadcasters to provide multiple programming choices, higher quality video, and enhanced capabilities to consumers.  Yet the transition has posed more challenges for VHF channels than UHF channels because VHF spectrum has proven to have characteristics that make it less desirable for

providing digital television service.  For instance, nearby electrical devices tend to emit noise that can cause interference to DTV signals within the VHF band, creating reception difficulties in urban areas even a short distance from the TV transmitter.  The reception of VHF signals also requires physically larger antennas compared to UHF signals.  For these reasons, among others, television broadcasters generally have faced greater challenges providing consistent reception on VHF signals than UHF signals in the digital environment, and some station owners have therefore opted to migrate their signals from VHF to UHF.  Therefore, on September 26, 2013, the Commission issued the NPRM in this proceeding proposing to eliminate the UHF discount and grandfather certain existing television station combinations that would exceed the 39 percent national audience reach cap in the absence of the discount, and seeking comment on whether a VHF discount should be adopted (28 FCC Rcd 14324).

      7.    <u>Authority to Modify the UHF Discount.</u>  We conclude that the Commission has the authority to modify the national audience reach cap, including the authority to revise or eliminate the UHF discount.  We find that no statute bars the Commission from revisiting the cap or the UHF discount in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to section 202(h) of the 1996 Act.  The CAA removed the requirement to review the national ownership cap from the Commission's quadrennial review requirement, but did not impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule.  While the CAA also provides that the Commission may not apply its forbearance authority under Section 10 of the Communications Act to any person or entity exceeding the 39 percent national audience reach cap, there is nothing in the CAA that suggests Congress intended to prevent the Commission from tightening the cap, repealing the UHF discount, or otherwise changing its

rules at a later date.  Thus, the Commission retains authority under the Communications Act to review any aspect of the national audience reach cap; it simply is not required to do so as part of the quadrennial review.

8.     Specifically, the Communications Act gives the Commission the statutory authority to revisit its own rules and revise or eliminate them when it concludes such action is appropriate.  The Act authorizes the agency to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."  Similarly, section 303(r) provides that the Commission may "[m]ake such rules and regulations. . . not inconsistent with this law, as may be necessary to carry out the provisions of this Act. . . ."  Indeed, courts have held that the Commission has an affirmative obligation to reexamine its rules over time.  In <u>Bechtel v. FCC</u> (957 F.2d 873), the court observed that "changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so.  In the rulemaking context, an agency also may be obligated to reexamine its approach if a significant factual predicate of a prior decision has been removed."  As we explain further below, this is precisely the case in this instance.

9.     With respect to the UHF discount, even those advocating retention of the discount based on the CAA acknowledge that the CAA does not even mention the UHF discount.  We disagree with commenters' suggestion that the CAA's legislative history somehow supports a conclusion that Congress fully considered either the UHF discount or the effect of the – then future – DTV transition.  The history of this immense, omnibus bill does not reflect any consideration of the UHF discount or its potential elimination.  There is no basis for the assumption that Congress, in overruling the Commission's decision to raise the national audience

reach cap to 45 percent and mandating it be moved back down to 39 percent, did so with the expectation that the Commission would indefinitely maintain the UHF discount, especially given that post-DTV transition there is no technological basis for the discount. We note further that, when Congress chose to supersede the Commission's action and revise the national audience reach cap down to 39 percent, it was on notice of the Commission's intent to phase out the discount, which the Commission had expressed in 1998 and again in 2002. Congress was also aware, of course, of the Commission's broad authority – indeed, its obligation – to reevaluate its rules periodically and revise any that no longer serve the public interest. It could have foreclosed the Commission from ever revising the national audience reach cap or the UHF discount by making the national cap and the UHF discount a statutory restriction or by otherwise withdrawing Commission authority to modify the cap or the UHF discount. It did not do so, opting instead for the limited measure that reduced the cap from 45 percent to 39 percent and relieved the Commission of the obligation to reevaluate the national audience reach cap in the mandated quadrennial ownership review.

10.    We agree with commenters who assert that these actions suggest Congress's intent was to prevent excessive consolidation in the broadcast market. In fact, as discussed below, operation of the analog-era discount after the DTV transition effectively allows some broadcasters with UHF stations to reach far more than the 45 percent of the national audience that Congress thought too high.

11.    Our interpretation of the CAA is consistent with the conclusion of the Third Circuit. As the court explained, although Congress excluded the national audience reach cap from the quadrennial review requirement under section 202(h), it did not foreclose Commission action to review or modify the UHF discount in a separate context.

12.     Elimination of the UHF Discount.  As in the NPRM, we conclude that television broadcasting in the UHF band is no longer technically inferior to operations in the VHF band. UHF stations no longer suffer from weaker signals and smaller audience reach, are less dependent today on over-the-air coverage, are more desirable than VHF stations for digital broadcasting, and therefore UHF station owners no longer need the UHF discount to remain viable and competitive.  Commenters in this proceeding have not presented evidence of any existing technical limitations that render digital UHF stations inferior to digital VHF stations.

13.     Therefore, we find that the DTV transition has rendered the UHF discount technically obsolete, and we eliminate it from the calculation of the national audience reach cap. As a result of the DTV transition, the national cap is effectively 78 percent for a station group that includes only UHF stations, and for any station group that includes a UHF station, the effective national cap now exceeds the 39 percent level that Congress directed the Commission to establish.  Rather than offsetting an actual service limitation or reflecting a disparity in signal coverage, the UHF discount serves only to confer a factually unwarranted benefit on owners of UHF television stations that undermines the purpose of the national audience reach cap. Furthermore, the Commission's ongoing experience reviewing media transactions after the DTV transition date indicates that failure to correct the distortion that the UHF discount causes in the calculation of national audience reach as a result of the DTV transition creates an ongoing potential that additional transactions could undermine the national audience reach cap.

14.     At the time the UHF discount was established, analog UHF television stations were demonstrably inferior to VHF stations, with weaker signals and a smaller audience reach. Thirty years after its adoption, however, it is clear that the UHF discount cannot be justified in the digital world.  While the discount was needed in the mid-1980s, the Commission soon found

that the disparity between analog UHF and VHF stations was unlikely to exist in perpetuity. Further, three decades ago roughly 60 percent of U.S. television households received programming exclusively over-the air, while according to the most recent Nielsen data, approximately 11.5 percent, or about 13.3 million television households, are broadcast-only.

15.    As early as 1988, the Commission noted that the disparities between UHF and VHF services had begun to decrease.  Further, as the disparity between the two services eroded during the 1980s and 1990s, the Commission repealed a number of rules and policies that had previously treated UHF stations differently, and occasionally more favorably, than their VHF counterparts.  In 1988 the Commission eliminated the UHF Impact Policy, which limited approval of new or modifications to existing VHF stations if the approval would harm existing or potential UHF stations (3 FCC Rcd 638).  In 1995, the Commission repealed both the Prime Time Access Rule, which prohibited network-affiliated television stations in the top 50 markets from broadcasting more than three hours of network programs during prime time (11 FCC Rcd 546), and the Secondary Affiliation Rule, which required a third network seeking an affiliate in a market to offer its programming first to the independent station, often a UHF station (10 FCC Rcd 4538).  By the mid-1990s, the Commission went so far as to note that the disparities between UHF and VHF stations had been largely ameliorated and the ability of UHF stations to compete against VHF stations had greatly improved (11 FCC Rcd 19949).

16.    The most important change, however, occurred with the DTV transition, which the Commission had long recognized would likely eliminate the inferiority of UHF channels.  In the 1998 Biennial Review Order, even though the Commission ultimately decided to retain the discount because the digital television transition was not yet complete, it indicated that the discount's days were numbered.  The Commission discussed at length its expectation that the

transition to digital broadcasting would potentially "rectify the UHF/VHF disparity" and that "the eventual modification or elimination of the discount for DTV [would] be appropriate." In the subsequent 2002 Biennial Review Order, the Commission determined that the issue was ripe and that the forthcoming DTV transition would substantially equalize UHF and VHF signals. The DTV transition has borne out the Commission's expectation.

17.     UHF spectrum is now highly desirable in light of its superior propagation characteristics for digital television. Since the 2009 DTV transition, 74 percent of the nation's television stations are now operating on UHF channels, and 80 percent of the aggregate television viewing population is served by UHF stations. As a result of the DTV transition, the number of UHF stations increased by 221 stations and the number of VHF stations decreased by 204 stations, indicating that over 200 stations, or approximately 15 percent of the total number of commercial television stations, switched spectrum bands in favor of UHF. In April 2010, Broadcasting & Cable noted that following the June 2009 DTV transition, the majority of U.S. TV stations had moved to UHF channels, which are better suited to broadcasting digital television at lower power level. Notably, the DTV transition preserved station coverage, and in many cases, allowed stations to improve coverage by upgrading their facilities, maximizing power, and capitalizing on improved propagation of digital television signals. Therefore, stations have enhanced their coverage and audience reach as a result of the DTV transition, both because of the technical superiority of digital broadcasts on UHF channels and as a result of the chance to maximize their signal coverage during the transition. The evidence clearly establishes that digital UHF operations do not suffer from the same technical limitations as analog UHF operations. This finding is consistent with past Commission decisions scrutinizing the necessity

of the UHF discount and recognizing the increased economic viability and success of the UHF band.

18.     Simply put, the UHF discount does not appropriately reflect the technical and economic reality of UHF facilities today.  In fact, the discount impedes the objectives of the national audience reach cap by effectively expanding the 39 percent cap beyond even the level that Congress determined was too high when it enacted the CCA.  Continued application of the UHF discount seven years after the DTV transition has the absurd result of stretching the national audience reach cap to allow a station group broadcasting exclusively on UHF channels to actually reach up to 78 percent of television households, dramatically raising the number of viewers that a station group can reach and thwarting the intent of the cap.

19.     While the discount was intended to make the calculation of an owner's audience reach better reflect the reality of the audience the stations actually reached, in current circumstances, applying the discount creates a loophole that allows owners to fail to count audience that the stations actually do reach.  Continued application of the antiquated UHF discount now has the unintended consequence of significantly discounting a station's actual audience reach for purposes of the rule when in reality the station's audience reach is not diminished at all by the use of UHF technology, but rather improved.

20.     Additionally, during the DTV transition, many stations that were broadcasting on VHF channels at the time the 39 percent cap was instituted shifted to UHF channels.  Even after the transition, a number of stations that initially elected to operate on a VHF channel sought to relocate to a UHF channel to resolve technical difficulties encountered in broadcasting digitally on a VHF channel.  Despite having signal coverage that was equal to, or even better than, its previous VHF channel, the former VHF station now received – for the first time – the benefit of

the UHF discount, i.e., a 50 percent reduction in the audience reach attributed to the station, all based on a discount intended to offset the inferiority of analog UHF signals. For instance, a licensee that traded an analog VHF station for a digital UHF station would now appear to have room to acquire additional stations under the 39 percent cap simply by virtue of having changed spectrum, even though the number of stations owned by the licensee and the audience reached by those stations remained the same. Such a result serves as an unwarranted windfall for stations that migrated from VHF to UHF in the DTV transition, in light of the general technical superiority of the digital UHF channels.

      21.    For example, in 2009, just prior to the DTV transition, Fox owned 27 stations with a total national audience reach of 37.22 percent before application of the UHF discount and 31.20 percent after application of the UHF discount. In 2010, immediately after the DTV transition, Fox continued to own 27 stations with a total national audience reach of 37.10 percent before application of the UHF discount. However, because five of Fox's stations switched from analog VHF channels to digital UHF channels in the transition, Fox's national audience reach calculation suddenly decreased with the benefit of the UHF discount, which allowed the station group to calculate its audience reach as only 24.75 percent – despite the fact that Fox still owned the same number of stations in the same markets reaching the same audiences. Although only five of Fox's stations switched from analog VHF to digital UHF channels in the DTV transition, these stations were all located in the top 10 DMAs, which account for a significant percentage of the television households in the nation. As a result, reducing the national audience reach by 50 percent for just a handful of stations in these larger markets had the effect of greatly reducing Fox's national audience reach calculation and potentially allowing significant additional

13

consolidation, although it had no effect on its actual national audience reach. This example demonstrates the absurd results created by the continued existence of the discount.

22.     We do not agree with commenters arguing that, apart from technical considerations, the discount remains necessary to promote competition, localism, and diversity, help non-network broadcast groups compete with stations owned and operated by the major broadcast networks, and foster the creation of new networks. Further, contrary to claims of some commenters, the Commission's decision in the 2002 Biennial Review Order to continue the UHF discount for stations not owned and operated by the Big Four networks was not based on a finding that such stations continued suffering from economic handicaps. The Commission clearly articulated that the UHF discount was predicated on the competitive disparity arising from the technical differences between the two types of channels, and merely deferred a decision on eliminating the discount. Any competitive disparity between UHF and VHF flowed from the technological disparity.

23.     As we have detailed above, following the transition to DTV, stations broadcasting on UHF spectrum are no longer competitively disadvantaged as compared to stations broadcasting on VHF spectrum. The record does not reflect evidence of any existing competitive disparity resulting from the continued deficiency of UHF signals. For example, no party has proffered evidence that advertisers routinely discount the prices paid for advertising on UHF stations versus VHF stations, as commenters alleged in the 2002 biennial review proceeding. Thus, we find no evidence that UHF stations today face a competitive disparity vis-à-vis VHF stations. In fact, as we note above, a number of former analog VHF stations chose to switch to UHF channels, further belying the suggestion that a competitive disparity persists between the two types of channels. We note further that the Commission has eliminated

14

previously the historic steep discount in annual regulatory fees assessed for UHF stations, combining UHF and VHF stations into a single fee category beginning in Fiscal Year 2014, thereby eliminating a distinction based on the historical disadvantages of UHF.

24.      Of course, this is not to say that all stations are now competitive equals. Disparities continue to exist between stations in terms of viewership, advertising revenue, retransmission consent fees, and programming, to name a few.  But these competitive disparities are not the result of any current technical differences between UHF and VHF stations.  Because UHF stations are no longer technologically disadvantaged, they can now compete effectively in a market with VHF stations.  Disparities between stations today are the result of market competition, programming choices, network affiliation, and capitalization.  We do not believe that retention of the UHF discount would resolve any of these competitive differences.  Finally, we disagree with any claim that removing the discount would frustrate the original purpose of the national cap; instead, removing the discount will prevent networks from expanding their reach, and our grandfathering regime, discussed below, will ensure that broadcasters that otherwise would exceed the cap after the discount is eliminated – none of which are the Big Four networks – will be grandfathered.

25.      Further, when the Commission stated in the 2002 Biennial Review Order that the UHF discount continues to be necessary to promote entry and competition among broadcast networks, the DTV transition was still a number of years in the future.  Contrary to the Commission's observations nearly a decade and a half ago, we do not see that the UHF discount is leading to the creation of new broadcast networks today.  The record contains no evidence that new broadcast networks are being built today by assembling a national station group of UHF broadcast stations.  Similarly, our most recent annual report on the state of competition among

15

video providers does not reflect a trend of emerging UHF broadcast networks.  Instead, it appears that new programming networks are emerging as cable networks, online video programmers, and multi-cast digital networks – methods that do not rely on the UHF discount. Therefore, the record in this proceeding does not support a conclusion that perpetuation of the UHF discount would foster the creation of new broadcast networks.

26.     We do not agree with commenters claiming that eliminating the UHF discount also requires an examination of the national audience reach cap.  Reexamining the cap is not within the scope of the NPRM, and we decline to initiate a further rulemaking proceeding at this time for that purpose.  No party has presented persuasive reasons for revisiting the national cap at this time, and doing so would be far more complex than the decision to eliminate the UHF discount, which we conclude clearly lacks any remaining justification.  Initiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap, which is the media ownership limit that Congress examined most recently, would only delay the correction of audience reach calculations necessitated by the DTV transition.  Delay would unnecessarily complicate efforts to bring the cap back into alignment with its stated level as broadcasters continue to increase their reach.  Continued application of the discount absent its technical justification simply distorts the operation of the national audience reach cap by exempting the portions of the audience that are receiving a signal from being counted and allowing licensees that operate on UHF channels to reach more than 39 percent of viewers nationwide.  Removal of the analog-era discount thus maintains the efficacy of the national cap. Although we do not foreclose the possibility of examining the national audience reach cap in the future, we find that action now to address the effects of the DTV transition by eliminating the UHF discount is appropriate.

27.     In this regard, our elimination of the UHF discount is unlike our adoption of the attribution rule for television joint sales agreements (TV JSAs), which the Third Circuit, in its recent ruling in connection with our quadrennial review of the multiple ownership rules, held was contrary to our periodic review obligation under section 202(h) (824 F.3d 33).  ("[T]he Commission cannot expand its attribution policies for an ownership rule to which § 202(h) applies unless it has, within the previous four years, fulfilled its obligation to review that rule and determine whether it is in the public interest.")  The Local TV ownership rule clearly is subject to periodic review under section 202(h), whereas the national television ownership cap is not subject to that obligation.  In addition, unlike our initial action on TV JSAs, we are grandfathering station groups that will exceed the national cap after we eliminate the UHF discount, so elimination of the UHF discount will not require divestitures by station owners.  Finally, as discussed above, retention of the UHF discount is indefensible, regardless of the level of the cap, because it is irrational in light of the digital transition.  Therefore, we reject the recent contentions of the National Association of Broadcasters and Fox that the Third Circuit's recent decision supports a conclusion that we cannot eliminate the UHF discount separately from a review of the national audience reach cap.

28.     Grandfathering Existing Broadcast Station Combinations.  We adopt the proposal for grandfathering reflected in the NPRM.  Specifically, we grandfather broadcast station ownership groups that would exceed the 39 percent national audience reach cap as a result of the elimination of the UHF discount as of September 26, 2013, the date of the NPRM.  As further proposed, we also grandfather proposed station combinations for which an assignment or transfer application was pending with the Commission or that were part of a transaction that had received Commission approval as of that date if such station groups would otherwise exceed the cap.  We

require any grandfathered ownership combination subsequently assigned or transferred to comply with the national audience reach cap in existence at the time of the transfer of control or assignment of license.  We find that these provisions provide an appropriate balance between the valid expectations of broadcast station ownership groups who exceed the cap solely as a result of the elimination of the UHF discount and the goals and purposes of the 39 percent national audience reach cap.  For this reason, we refuse to adopt a more limited grandfathering regimen or no grandfathering provision whatsoever, as urged by some commenters.

29.     No broadcasters will exceed the national cap following the elimination of the UHF discount with a combination that will not be fully grandfathered by this decision.  No broadcast transactions since the release of the NPRM have resulted in an entity exceeding the national ownership cap.  Thus, as a practical matter, there is no actual difference in grandfathering as of the date of the NPRM or the date of this Report and Order.  Despite one commenter's claims, the Commission has continued to evaluate and approve broadcast transaction applications during the pendency of this proceeding.  The grandfathering proposal adopted today protects the existing ownership structure as of the release of this Report and Order for all broadcast television station groups that will exceed the national audience reach cap upon the elimination of the UHF discount.  Given the long history of notice that the UHF discount would be eliminated following the DTV transition and the potential for significant distortion of the national audience reach cap – indeed, the potential to double the national cap – the decision to use the date of the NPRM as the grandfathering date is fully supported and best serves the public interest.

30.     Grandfathering as of the date of the NPRM is consistent with previous Commission decisions.  For example, the grandfathering of interests in connection with the

Commission's equity/debt plus rule and the attribution of Local Marketing Agreements (LMAs) each used the date of the notice in those proceedings as the cut-off date (14 FCC Rcd 12559 and 14 FCC Rcd 12903).  Therefore, the Commission is not persuaded to designate the adoption date of this <u>Report and Order</u> as the grandfathering date for the UHF discount as some commenters request.  Proposing such a grandfathering date would have provided an incentive to broadcasters to rush to engage in new transactions that could have diluted the effectiveness of the Commission's action to preserve the national audience reach cap by eliminating the outdated and technically unsupported UHF discount, perpetuating the distortive effect of this anachronistic regulation.

31.    Further, this grandfathering date does not disrupt expectations because the industry has been on notice for at least 20 years that the UHF discount would likely be eliminated following the transition to DTV.  The Commission further stated in the <u>1998 Biennial Review Order</u> that it expected to eliminate the UHF discount after completion of the DTV transition.  The Commission, in fact, had previously decided to phase out the UHF discount, although that phase-out was rendered moot by congressional action.  The grandfathering proposal adopted today ensures that, going forward, the national audience reach of broadcast station groups is reflected accurately in the broadcast television market while not penalizing those station groups which exceed the national audience reach cap solely as a result of eliminating the UHF discount.

32.    The grandfathering mechanism adopted here does not make the decision to eliminate the UHF discount retroactive.  This action does not alter the past lawfulness of station combinations, does not impose any liability for having assembled station groups that would be prohibited going forward, and does not introduce any retrospective obligations for past conduct.

As noted above, by grandfathering existing station groups that would exceed the national audience reach cap without the continued benefit of the UHF discount as of the date of the NPRM, we protect all existing broadcast television station ownership combinations that would otherwise exceed the cap from the future effect of this change, even though application of the revised rule to them would not be considered retroactive.

33.     While some commenters urge adoption of permanent grandfathering of station groups that resulted in the creation of a new broadcast network, the Commission concludes that its decision not to allow the transferability of grandfathering is fully consistent with prior Commission practice regarding grandfathering; for example, the 1999 Local TV Ownership Order (14 FCC Rcd 12903) and the 2014 Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions Order (29 FCC Rcd 6567).  This approach strikes the appropriate balance between avoiding imposition of the hardship of divestiture on owners of existing station combinations who have long owned the combination in reliance on the rules, and moving the industry toward compliance with current rules when owners voluntarily decide to sell their stations.  The grandfathering rule adopted preserves several existing combinations that resulted in new broadcast networks.  Networks continue to exist with owned and operated station groups that comply with the national audience reach cap, or which are far below the nearly 65 percent nationwide coverage reached by one grandfathered station group.  In addition, even if the Commission permitted a grandfathered station group to be transferred intact, there would be no obligation for the new buyer to maintain the stations' current network affiliation or the programming aired by the current licensee.  Thus, we conclude that the public interest would not be served by allowing grandfathered combinations to be freely transferable in perpetuity where a

combination does not comply with the national audience reach cap at the time of transfer or assignment simply because the combination once resulted in a new network.

34.     Finally, we find that the record does not support one commenters' request that the Commission fashion a specific waiver standard for violations of the national audience reach cap that result from elimination of the UHF discount.  Parties may always petition the Commission for a waiver under our existing rules if they believe unique circumstances warrant a waiver in a particular case.  However, we expect such circumstances to be rare and isolated given that only a few existing broadcast television station ownership groups will exceed the cap after elimination of the discount.  Ultimately, there are many different ways to structure an assignment or transfer of control that may present varying levels of concern regarding the potential impact of a proposed transaction.  Given the fact-specific nature of our review of such transactions, a specific waiver standard is not appropriate.  Instead, we conclude that a case-by-case approach will best serve the public interest by allowing the Commission to consider the unique circumstances of any proposed transaction involving grandfathered combinations and its potential impact on competition.

35.     <u>VHF Discount.</u>  We disagree with commenters claiming that eliminating the UHF discount also requires the concurrent adoption of a VHF discount.  As noted above, the DTV transition has made UHF spectrum generally more desirable than VHF spectrum for purposes of digital television broadcasting.  Yet, despite the challenges to the digital VHF band, the current record does not demonstrate that digital television operations in the VHF band are universally technically inferior to operations in the UHF band in a manner or to a degree that would warrant a discount.  The record does not provide clear evidence that digital VHF stations consistently suffer from significant technical disadvantages in audience coverage sufficient to justify

21

adoption of a discount. Further, the record lacks evidence that the economic viability of VHF stations would be threatened without a discount. Moreover, the Commission has already taken steps to assist individual VHF stations in addressing technical concerns. Accordingly, we decline to adopt a VHF discount at this time.

36.     Procedural Matters.  As required by the Regulatory Flexibility Act of 1980, as amended (RFA), the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order in MB Docket No. 13-236, which is summarized below.

37.     This Report and Order does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002.

38.     Final Regulatory Flexibility Analysis.  The Regulatory Flexibility Act (RFA) directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted in the Report and Order. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

39.     Television Broadcasting.  The SBA designates television broadcasting stations with $38.5 million or less in annual receipts as small businesses. Television broadcasting includes establishments primarily engaged in broadcasting images together with sound. These

22

establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public.  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The Commission estimates that there are 1,387 licensed commercial television stations in the United States.  In addition, according to Commission staff review of the BIA/Kelsey Media Access Pro Television Database as of March 25, 2016, 1,264 (or about 91 percent) of the estimated 1,387 commercial television stations have revenues of $38.5 million or less and, thus, qualify as small entities under the SBA definition. We therefore estimate that the majority of commercial television broadcasters are small entities. The Commission has also estimated the number of licensed noncommercial educational (NCE) television stations to be 390.  These stations are non-profit, and therefore considered to be small entities.

40.     We note, however, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, an element of the definition of small business is that the entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive to that extent.

41.    The Report and Order modifies the calculations underlying the national television multiple ownership rule as set forth above, which would affect reporting, recordkeeping, or other compliance requirements.  The conclusion modifies several FCC forms and their instructions: (1) FCC Form 301, Application for Construction Permit for Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License.  The Commission may have to modify other forms that include in their instructions the media ownership rules or citations to media ownership proceedings, including Form 303-S and Form 323.  The impact of these changes will be the same on all entities, and we do not anticipate that compliance will require the expenditure of any additional resources as the proposed modification to the calculations underlying the national television multiple ownership rule will not place any additional obligations on small businesses.

42.    The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.  The NPRM invited comment on issues that had the potential to have significant impact on some small entities.

43.    The rule change adopted in this Report and Order, as set forth above, is intended to achieve our public interest goal of competition.  By recognizing the technical advancements of

the UHF band after the DTV transition, this <u>Report and Order</u> seeks to create a regulatory landscape that reflects the current value of UHF spectrum in order to better assess national television ownership figures.  Further, this <u>Report and Order</u> complies with the President's directive for independent agencies to review their existing regulations to determine whether such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives.  By eliminating an outdated rule, we seek to reduce the costs and burdens of compliance on firms generally, including small business entities.  And we find that the benefits of our decision to eliminate the UHF discount outweigh any costs or other burdens that may result from our action. In addition, the grandfathering proposal the Commission adopts in the <u>Report and Order</u> aims to create a more effective regulatory landscape by addressing current market realities.  Overall, this <u>Report and Order</u> seeks to expand broadcast ownership opportunities for station owners, which includes small entities, by accurately reflecting broadcast television ownership in the digital age. Given that the technical justification for the UHF discount no longer exists, continued application of the discount stifles competition by encouraging consolidation instead of promoting new entrants in local broadcast television markets.  Therefore, the Commission believes the rule change adopted in this <u>Report and Order</u> will benefit small entities, not burden them.

44.    <u>Ordering Clauses.</u>  Accordingly, IT IS ORDERED that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, this <u>Report and Order</u> IS ADOPTED.  The rule modification below shall be effective [**INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

IT IS FURTHER ORDERED that the Commission SHALL SEND a copy of this <u>Report and Order</u> to Congress and to the Government Accountability Office pursuant to the Congressional Review Act.

<u>List of Subjects in 47 CFR Part 73</u>

Television, Radio.

**FEDERAL COMMUNICATIONS COMMISSION**


Gloria J. Miles,
<u>Federal Register Liaison Officer.</u>
Office of the Secretary.


For the reasons discussed in the preamble, The Federal Communication Commission amends 47 CFR part 73 as follows:

**PART 73 – RADIO BROADCAST SERVICES**

    1.  The authority citation for part 73 continues to read as follows:

    **Authority**:  47 U.S.C. 154, 303, 334, 336, and 339.

    2.  Amend § 73.3555 by revising paragraphs (e)(1) and (e)(2)(i) to read as follows:

<u>**§ 73.3555 Multiple ownership.**</u>

* * * * *

    (e) * * *

    (1) No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners,

members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

(2) * * *

(i) National audience reach means the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license.

* * * * *

[FR Doc. 2016-25569 Filed: 10/21/2016 8:45 am; Publication Date:  10/24/2016]

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016, the foregoing Underlying Decision has been electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Mace Rosenstein*
Mace Rosenstein